El Juez Asociado Señor Feliberti Cintrón
emitió la opinión del Tribunal.
Hoy resolvemos por primera vez, desde la incorporación de New York Times Co. v. Sullivan, 376 US 254 (1964), a nuestra doctrina de difamación, que un funcionario público probó adecuadamente que la prensa escrita obró con mali-cia real al publicar aseveraciones difamatorias en su contra; es decir, con un grave menosprecio de si lo divulgado era cierto o no.
*131 De otra parte, a través del proceso judicial se generaron una serie de controversias novedosas de índole procesal y sustantiva que igualmente nos vimos precisados a atender en estos recursos. Así pues, aplicamos a la situación del presente caso los criterios establecidos en la Regla 64 de Procedimiento Civil, 32 LPRA Ap. III (ed. 2001) (Regla 64 de Procedimiento Civil)(1) sobre la sustitución de un juez una vez comenzado un juicio. También fijamos el estándar de revisión apropiado en casos de difamación de un funcio-nario público. Por último, y no menos importante, delimi-tamos el alcance del privilegio de una comunicación difa-matoria hecha en un procedimiento autorizado en ley cuando las comunicaciones también se ofrecen a los medios públicos.
I
El 3 de septiembre de 1990 la Leda. Iris Meléndez Vega (licenciada Meléndez o la fiscal Meléndez) fue designada Directora del Centro Metropolitano de Investigaciones y Denuncias (CMID) del Departamento de Justicia. Para en-tonces, y desde noviembre de 1987, la Sra. Martha Marrero Rivera (señora Marrero) se desempeñaba como Secretaria Legal I del Director y Subdirector del CMID. Basado en la capacidad demostrada por la señora Marrero para ejercer sus funciones, a esta se le había delegado ciertas labores administrativas que no le correspondían a su puesto. In-cluso, se había tramitado una recomendación para cambiar su puesto a Secretaria Legal II. No obstante, debido a que el cambio no se había podido realizar a causa de las finan-zas del Departamento de Justicia, quedó pendiente su reclasificación.
Cuando la licenciada Meléndez fue nombrada Directora del CMID, decidió retener a la señora Marrero como su *132 secretaria. Transcurrido un tiempo, la licenciada Meléndez se percató de que existía cierta tensión entre la señora Ma-rrero y otros funcionarios del CMID, por lo que decidió li-mitar las responsabilidades de la señora Marrero a aque-llas que le correspondían a su puesto de Secretaria Legal I. Estos cambios internos representaron para la señora Ma-rrero un tipo de descenso, por lo que no estuvo conforme.
Según surge de los autos del caso, la relación laboral Directora-Secretaria se fue deteriorando marcadamente, hasta que la señora Marrero eventualmente se trasladó fuera del CMID en junio de 1991. Las versiones de ambas funcionarias difieren en cuanto a los motivos de dicho tras-lado: por un lado, la señora Marrero sostiene que se tras-ladó fuera del CMID por ser víctima de hostigamiento sexual por parte de la licenciada Meléndez, mientras que esta última niega que dicho hostigamiento haya ocurrido, a la vez que aduce que la señora Marrero es una empleada difícil de complacer.
Luego de presentar una querella por alegado hostiga-miento sexual contra la licenciada Meléndez ante el fiscal Pedro Goyco Amador (fiscal Goyco), Director de la Oficina de Investigación y Procesamiento Criminal del Departa-mento de Justicia, la señora Marrero ofreció su versión sobre este asunto a un periodista de El Vocero de Puerto Rico (El Vocero), el Sr. José A. Purcell (señor Purcell). Con la información brindada, el 5 de noviembre de 1991 El Vo-cero publicó en primera plana una noticia donde se repor-taba que la licenciada Meléndez había hostigado sexual-mente a su exsecretaria y que altos funcionarios del Departamento de Justicia habían tratado de “amapuchar” la querella. Ese escrito fue el primero de una serie de cua-renta y tres artículos publicados durante veintitrés meses por dicho rotativo que giraron en torno a este tema.
La subsiguiente investigación de la querella de hostiga-miento sexual que realizó el Departamento de Justicia desde noviembre de 1991 hasta junio de 1992, la cual contó *133 con más de veintidós declaraciones juradas, exoneró a la licenciada Meléndez y concluyó que los incidentes de hos-tigamiento sexual imputados por la señora Marrero nunca ocurrieron.
A base de las múltiples publicaciones de El Vocero, el 19 de junio de 1992 la licenciada Meléndez instó en el Tribunal de Primera Instancia, Sala de San Juan, una demanda en daños y perjuicios por difamación contra la señora Ma-rrero, el señor Purcell, Caribbean International News Corp., El Vocero de Puerto Rico, Inc. y el Sr. Gaspar Roca (señor Roca), entonces Presidente y Director del diario.(2) Se enmendó posteriormente la demanda para incluir al Ledo. Héctor Santiago Rivera (licenciado Santiago Rivera), representante legal de la señora Marrero, por éste enviar varias comunicaciones alegadamente difamatorias al en-tonces Secretario de Justicia, Hon. Jorge Pérez Díaz (Se-cretario de Justicia), que luego fueron objeto de varios ar-tículos por parte de El Vocero. En síntesis, la licenciada Meléndez alegó en su demanda que lo diseminado era falso y que todos los demandados lo publicaron a sabiendas de su falsedad o con grave menosprecio de si era falso o no, causándole daños a su reputación y graves angustias mentales.
La señora Marrero, la prensa y el licenciado Santiago Rivera aducen que lo publicado por ellos era cierto. La prensa argumenta, en la alternativa, que aunque no fuera cierto no obró con malicia real, porque su fuente principal era la señora Marrero, quien merecía entera credibilidad. El licenciado Santiago Rivera alega, por su parte, que lo expresado por él era privilegiado por ser expresiones he-chas durante un procedimiento autorizado por ley.
El juicio en su fondo, el cual duró 91 días, estuvo pla-gado de varios retrasos y paralizaciones. Véanse: In re Marchand Quintero, 151 DPR 973 (2000); Meléndez v. *134 Caribbean Int’l. News, 151 DPR 649 (2000). Después de presidir el juicio durante cincuenta y cuatro días, el juez superior Víctor Rivera González (juez Rivera González) se retiró de la judicatura en diciembre de 2000. Tras revisar las transcripciones de toda la prueba presentada hasta el momento, para comienzos del 2002 el juez Luis Roque Co-lón (juez Roque Colón) continuó a cargo del juicio. Pasados casi doce años desde el inicio del caso, el 1 de marzo de 2004 el Tribunal de Primera Instancia dictó Sentencia(3) mediante la cual declaró "con lugar” la demanda contra todos los demandados por estos haber obrado con malicia real al difundir las falsas alegaciones de hostigamiento sexual. Ordenó el pago de daños ascendentes a $1,815,000 por angustias mentales y daños a la reputación de la licen-ciada Meléndez, más $100,000 en concepto de honorarios de abogado por temeridad, con intereses legales sobre am-bas cuantías al cinco por ciento desde la fecha de la pre-sentación de la demanda, hasta la fecha cuando se dictó la Sentencia.
Inconformes, todos los demandados acudieron ante el Tribunal de Apelaciones solicitando la revocación del dicta-men del Tribunal de Primera Instancia. El tribunal apela-tivo intermedio, mediante Sentencia de 28 de febrero de 2007, confirmó al foro de instancia en aquella parte de la Sentencia apelada en que se le impuso a la señora Marrero y a la prensa la obligación de indemnizar a la licenciada Meléndez, así como en el monto de daños asignados por el tribunal juzgador. Sin embargo, revocó la determinación de responsabilidad civil en cuanto al licenciado Santiago Rivera por dos razones: (1) sus comunicaciones no cumplían con el requisito de referencia específica a la licenciada Me-léndez y (2) el letrado estaba cobijado por el privilegio de *135 comunicaciones hechas en el curso de un procedimiento au-torizado en ley.
Todas las partes comparecen a este Tribunal, excepto el licenciado Santiago Rivera. Consolidamos los recursos de la señora Marrero, la prensa y la licenciada Meléndez, todos acogidos como recursos de certiorari.(4) Como cuestión de umbral, la señora Marrero adujo que erró el Tribunal de Primera Instancia al continuar el juicio con el juez Roque Colón y al dictar Sentencia valiéndose de una transcrip-ción de varios testimonios, los cuales no presenció, vio-lando así su derecho a un debido proceso de ley. Argu-mentó, además, que erró el Tribunal de Apelaciones en su análisis de la Regla 64 de Procedimiento Civil, la cual rige la sustitución de un juez.(5)
*136 Como próximo señalamiento de error, la señora Marrero y la prensa(6) plantearon que erró el Tribunal de Apelacio-nes al no efectuar una evaluación independiente de la *137 prueba en un pleito de difamación, donde la licenciada Meléndez tenía que probar malicia real con prueba clara y convincente.
Del mismo modo, y en cuanto a los méritos de la Sen-tencia recurrida, la señora Marrero refutó que procediera la acción en su contra, basándose en los siguientes tres argumentos: (1) que estaba cobijada por el privilegio de comunicaciones hechas en un procedimiento autorizado por ley, dado que había presentado una querella por hosti-gamiento sexual en el Departamento de Justicia; (2) que no se le podía imponer responsabilidad por las publicacio-nes de El Vocero por no haber participado o haberlas con-trolado, y (3) que la totalidad de la prueba no establecía falsedad ni existencia de malicia real.
La prensa por su parte alegó, en términos generales, que el Tribunal de Apelaciones no aplicó las normas cons-titucionales relativas a la protección de los derechos fun-damentales a la libertad de prensa y de expresión. Especí-ficamente, argumentó que faltaba evidencia que demostrara malicia real; que gozaba del privilegio del in-forme justo y verdadero, y que el Tribunal de Apelaciones no revisó adecuadamente cada artículo impugnado por la licenciada Meléndez para aseverar que eran de índole difamatoria.
Ambas partes sostuvieron que los daños concedidos a la licenciada Meléndez eran exagerados y de naturaleza pu-nitiva, y que la imposición de honorarios de abogado por temeridad fue errónea.
Por otro lado, la licenciada Meléndez señaló dos errores al Tribunal de Apelaciones relacionados con la exoneración de responsabilidad del licenciado Santiago Rivera:
A. Erró el [Tribunal de Apelaciones] al resolver que [le] asiste a Santiago Rivera el privilegio de comunicación por un abo-gado en un procedimiento autorizado por ley[.]
B. Erró el [Tribunal de Apelaciones] al resolver que la prueba contra Santiago Rivera no satisface el requisito de referencia a *138 la demandante[.] Caso Núm. CC-2007-827, Pieza 1, Petición de certiorari, pág. 10.
Evaluados los recursos, acordamos expedir. Tras anali-zar todos los escritos ante nuestra consideración, así como el derecho aplicable, procedemos a resolver las controver-sias presentadas. Atenderemos estas controversias en el orden siguiente. Descartaremos, primero, la controversia inicial planteada por la señora Marrero referente a la sus-titución del juez de instancia. Segundo, discutiremos las controversias relacionadas con el estándar de revisión ape-lativa exigido en un caso de difamación. Tercero y cuarto, evaluaremos la responsabilidad del licenciado Santiago Rivera a la luz del privilegio estatutario extendido a las co-municaciones difamatorias hechas en el transcurso de un procedimiento autorizado por ley y el requisito de referen-cia específica. Continuamos analizando si la señora Ma-rrero y la prensa difamaron a la licenciada Meléndez, aten-diendo a las defensas planteadas por cada una. Final-mente, revisaremos la cuantía de los daños y la imposición de honorarios adjudicada por el tribunal sentenciador.
II

Sustitución de un juez durante un juicio ya iniciado

La señora Marrero refuta el análisis expuesto por el Tribunal de Primera Instancia y el Tribunal de Apelaciones sobre lo apropiado que pueda resultar sustituir a un juez en medio de un juicio en su fondo, conforme a la Regla 64 de Procedimiento Civil. Argumenta que se le violó el debido proceso de ley, ya que el juez Roque Colón solo consideró una transcripción de los testimonios de varios testigos que desfilaron ante el juez Rivera González en la primera fase del juicio para llegar a su determinación de credibilidad, factor definitivo en este caso de difamación donde la vera- *139 cidad de las expresiones está en juego. La señora Marrero solicita, por lo tanto, que ordenemos la celebración de un nuevo juicio.
 Por primera vez tenemos la oportunidad de expre-sarnos sobre el procedimiento de sustitución de un juez tal como lo disponen las Reglas de Procedimiento Civil. La Regla 64 de dicho cuerpo legal, tal como estuvo en vigor para la fecha del juicio en el caso de autos, exponía:
Si por razón de muerte, enfermedad, o por cualquier otra razón, un juez no pudiere continuar entendiendo en un asunto, otro juez podrá actuar en su lugar; pero si éste se convenciere de que no puede desempeñar dichos deberes, sin la celebración de un nuevo juicio sobre todos o parte de los hechos o sin oír nuevamente a algún testigo, podrá tomar las medidas que fueren necesarias para resolver el pleito. (Enfasis nuestro). 32 LPRA Ap. III (ed. 2001).(7)
El tratadista de derecho procesal civil José A. Cuevas Segarra manifiesta que surge de dicha disposición legal que “[e]s discrecional del nuevo magistrado determinar si debe celebrar un nuevo juicio sobre todos o parte de los hechos”, pero advierte que “[n]o es una invitación a la relitigación de los asuntos que ya han sido determinados por otro juez”. J.A. Cuevas Segarra, Tratado de derecho procesal civil, San Juan, Pubs. JTS, 2000, T. II, pág. 1137.
Cuando se adoptó la Regla 64 de Procedimiento Civil en el 1979, su contenido era sustancialmente similar a la Regla 63 de Procedimiento Civil federal (Regla 63), la cual, para ese entonces, disponía:
If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a *140 verdict is returned or findings of fact and conclusions of law are filed, then any other judge regularly sitting in or assigned to the court in which the action was tried may perform those duties; but if such other judge is satisfied that he cannot perform those other duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial. (Énfasis nuestro). Fed. R. Civ. P. 63, 28 USC App. (1937).
Es menester señalar que, en aquel momento, la regla federal era más restrictiva que la nuestra al limitar la po-sibilidad de sustituir un juez en la etapa final del litigio de un caso, es decir, solo después de que el juez original hu-biese expuesto sus determinaciones de hechos y de derecho. La antes mencionada condición para la sustitu-ción de un juez no se reflejó en nuestra regla, sino que esta le delega al juez sustituto la discreción de determinar si puede desempeñar los deberes involucrados en la conti-nuación de un caso que comenzó otro juez, independiente-mente de cuáles sean esos deberes y el momento cuando ocurre la sustitución.
En el 1991, la regla federal se enmendó sustancial-mente por primera vez desde el 1937, incorporando nuevas medidas y obligaciones para los jueces sustitutos:
If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties. In a hearing or trial without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness. Fed. R. Civ. P. 63, 28 USCA App (1937).(8)
*141 La nueva regla federal ahora facilita la sustitución de un juez en cualquier fase de un juicio si el nuevo juez cer-tifica, no solo que está familiarizado con el expediente, sino también que continuar el caso bajo su intervención no le resultará perjudicial a parte alguna. En un caso sin Ju-rado, el juez sustituto siempre estará obligado, si una parte así lo desea, a llamar a declarar nuevamente a aque-llos testigos que estén disponibles y cuyos testimonios sean esenciales y estén en disputa.
Las notas del Advisory Committee on Rules de la regla federal enmendada explican, de este modo, el propósito del cambio:
The former rule made no provision for the withdrawal of the judge during the trial, but was limited to disqualification after trial. Several courts concluded that the text of the former rule prohibited substitution of a new judge prior to the points described in the rule, thus requiring a new trial, whether or not a fair disposition was within reach of a substitute judge.
The increasing length of federal trials has made it likely that the number of trials interrupted by the disability of the judge will increase. An efficient mechanism for completing these cases without unfairness is needed to prevent unnecessary expense and delay. To avoid the injustice that may result if the substitute judge proceeds despite unfamiliarity with the action, the new Rule provides, in language similar to Federal Rule of Criminal Procedure 25(a), that the successor judge must certify familiarity with the record and determine that the case may be completed before that judge without prejudice to the parties. This will necessarily require that there be available a transcript or a videotape of the proceedings prior to substitution. (Énfasis nuestro y citas omitidas). Fed. R. Civ. P. 63, 28 USC App. (1991).
De esta manera, el cambio propició la sustitución de un juez antes de que se terminase un juicio si éste, por alguna razón, se encuentra imposibilitado de continuar a cargo de los procedimientos, siempre y cuando se sigan los criterios implantados para asegurar que el proceso sea justo para las partes. Por lo tanto, la regla federal refleja la preferen-cia de evitar el comienzo de un nuevo juicio a menos que *142 sea necesario. Esta consideración tiene especial significado cuando, tomando en cuenta las circunstancias particulares del caso, el juez sustituto está preparado para disponer del asunto, mientras que un nuevo juicio crearía una demora onerosa.
Nuestra Regla 64 de Procedimiento Civil, sin embargo, no presentaba estas barreras procesales y desde su inicio lograba el mismo fin que su contraparte federal al facilitar la sustitución de un juez después de comenzado un juicio. Esta visión más liberal constituye un mecanismo eficiente para continuar con el desarrollo y progreso de un juicio largo que se ha visto interrumpido porque un juez no ha podido cumplir con sus deberes hasta la resolución final del caso. La regla se diseñó con las salvaguardas necesa-rias para proteger contra la injusticia que pueda resultar si un juez no familiarizado con el caso emite una sentencia. Para ello provee mecanismos para que el nuevo juez tome el curso de acción que, en su discreción, estime necesario para disponer adecuadamente del pleito, incluyendo orde-nar la celebración de un nuevo juicio sobre parte o todos los hechos, u oír nuevamente declarar a algún testigo.
Ahora bien, aunque un juez sucesor tiene plena autoridad de resolver un caso heredado, lo cierto es que no tiene la preparación adecuada para evaluar la credibilidad de testigos que no presenció declarar, aunque tenga una transcripción completa del testimonio. En nuestro ordenamiento judicial le asignamos mayor deferencia al tribunal de instancia en cuanto a su apreciación de la prueba precisamente porque estuvo en mejor posición para aquilatar la prueba testifical, ya que tuvo la oportunidad de oír y ver el comportamiento del testigo. Pueblo v. Irizarry, 156 DPR 780, 815 (2002); Hernández v. San Lorenzo Const., 153 DPR 405, 425 (2001). Teniendo en cuenta que la adjudicación de hechos no es tarea fácil ni sencilla, y que es una *143 labor llena de elementos subjetivos,(9) si un juez sustituto no tuvo el beneficio de escuchar a un testigo declarar y reaccionar bajo juramento, sino que simplemente leyó una transcripción de dicho testimonio, su determinación de credibilidad no merece esa deferencia.
José Cuevas Segarra afirma que un juez sustituto “no está en condiciones de pasar credibilidad sobre testigos que no ha escuchado”. Cuevas Segarra, op. cit., pág. 1137. Más bien, lo importante “es determinar si la falta de contacto del nuevo juez con la prueba desfilada lo coloca en una condición incapaz de desentrañar la verdad del cúmulo de ésta”. íd., págs. 1137-1138. Véase Trib. Exam. Méd. v. Cañas Rivas, 154 DPR 29, 45 (2001) (“Determinamos que en procedimientos disciplinarios en los cuales existan impor-tantes cuestiones de credibilidad, no debe el juzgador de los hechos aceptar que el caso sea sometido a base de una transcripción de la prueba de los testimonios pertinentes. De ordinario, el juzgador de los hechos debe recibir direc-tamente los testimonios referidos para poder aquilatar su valor de manera óptima”).
De igual manera, el Advisory Committee on Rules de la Regla 63 federal enmendada distingue entre la capacidad de un juez sustituto de llegar a una determinación de he-chos basada en prueba que nunca escuchó, versus el poder sopesar la credibilidad de un testigo que no tuvo presente ante sí.
The revised [rule] authorizes the substitute judge to make a finding of fact at a bench trial based on evidence heard by a different judge. This may be appropriate in limited circumstances. First, if a witness has become unavailable, the testimony recorded at trial can be considered by the successor judge pursuant to F.R.Ev. 804, being equivalent to a recorded deposition available for use at trial pursuant to Rule 32. For this purpose, a witness who is no longer subject to a subpoena *144 to compel testimony at trial is unavailable. Secondly, the successor judge may determine that particular testimony is not material or is not disputed, and so need not be reheard. The propriety of proceeding in this manner may be marginally affected by the availability of a videotape record; a judge who has reviewed a trial on videotape may be entitled to greater confidence in his or her ability to proceed.
The court would, however, risk error to determine the credibility of a witness not seen or heard who is available to be recalled. (Énfasis nuestro). Fed. R. Civ. P. 63, 28 USC App. (1991).
Véanse: Patelco Credit Union v. Sahni, 262 F.3d 897, 906 (9no Cir. 2001) (“‘[T]he successor judge may examine the trial transcript as if it were ‘supporting affidavits’ for summary judgment purposes and enter summary judgment if no credibility determinations are required” (corchetes en el original)), citando 12 Moore’s Federal Practice Sec. 63.05[3] (3ra ed. 1999); Mergentime Corp. v. WMATA, 166 F.3d 1257 (D.C.Cir. 1999); Henry A. Knott Co. v. Chesapeake & Potomac Tel. Co., 772 F.2d 78, 85 (4to Cir. 1985) (“A hearing de novo before a new successor master or before the district court must be conducted if the case requires the trier of fact to make credibility determinations concerning the testimony of witnesses; otherwise the parties [’] right to a full due process hearing would be severely undercut”).
En el caso de autos, el juicio tardó ocho años en iniciarse ante el juez Rivera González.(10) Se desfiló una prueba tes-tifical extensa durante 54 días,(11) hasta que el juez Rivera González se retiró de la Judicatura en diciembre del 2000. El 26 de marzo de 2001 el caso fue asignado al juez Roque Colón, quien rápidamente celebró una vista para acordar *145 un plan de trabajo para la resolución del caso.(12) Posteriormente, y con el beneficio de haber analizado en su totalidad la transcripción de la prueba presentada ante el juez anterior, el juez Roque Colón quedó convencido de que podía continuar con los procedimientos sin necesidad de iniciar un nuevo juicio.(13) No obstante, aclaró que “[s]i para la adjudicación final del caso, nos convenciéramos de que fuera necesario oír nuevamente parte del testimonio de al-guno de los testigos ya presentados así lo determinaremos oportunamente”.(14) Al reafirmar dicha decisión en reconsideración, el juez Roque Colón se cercioró que cumplía con el objetivo de garantizar una solución rápida y económica del caso, apoyándose en los recursos provistos por las Reglas de Procedimiento Civil y en que al así proceder no se violaba el debido proceso de ley a ninguna de las partes involucradas.(15)
El juicio continuó durante treinta y siete días adiciona-les, durante los cuales se terminó de presentar la prueba de la licenciada Meléndez, incluyendo su testimonio, así como la mayoría de la prueba de los demandados. Destaca-mos que el juez Roque Colón tuvo la oportunidad de ver y escuchar a la señora Marrero testificar en vivo durante dos días, tiempo que consideramos suficiente para poder apre-ciar su credibilidad por sí mismo.
Así las cosas, el Tribunal de Apelaciones correctamente concluyó que el juez Roque Colón cumplió con las exigen-cias de la Regla 64 de Procedimiento Civil, supra, sin que se violase el debido proceso de ley de ninguna de las partes. Ciertamente, la regla no exige la celebración de un nuevo *146 juicio en todas las ocasiones en que se sustituye un juez. Por el contrario, delega al juez sustituto la autoridad para determinar el curso adecuado a seguir para la más efectiva y justa disposición de un caso. El juez Roque Colón actuó razonablemente al continuar los procedimientos tomando el lugar de su antecesor y reservándose el derecho de lla-mar nuevamente a cualquier testigo, de estimarlo necesario.(16) Con su determinación, el juez sustituto logró un balance apropiado entre permitir la continuación de un juicio ya muy aplazado y velar por que no se llegara a una conclusión equivocada o parcial.
Además, el juez Roque Colón no transgredió la referida Regla 64 de Procedimiento Civil, según argumenta la se-ñora Marrero, al valerse únicamente de una transcripción para sopesar la credibilidad de esta frente a la de la licen-ciada Meléndez, quien el juzgador escuchó y vio testificar de principio a fin. La señora Marrero falla al no reconocer que el juez Roque Colón tuvo la oportunidad de verla y escucharla directamente, y comprobar su veracidad. Du-rante el tiempo que la señora Marrero testificó ante el Juez Roque Colón, éste la vio y oyó declarar sobre varios inci-dentes ocurridos entre ella y la licenciada Meléndez, inclu-yendo los eventos del 21 de diciembre de 1991. Ese día la señora Marrero regaló ropa interior y maquillaje a la licen-ciada Meléndez —su supuesta hostigadora— y presunta-mente la fiscal le agarró el glúteo. Cabe señalar, además, que los fiscales Goyco y Lora, quienes se presentaron como testigos en la primera fase del juicio, fueron llamados a testificar por segunda vez ante el juez sustituto a petición de los demandados. Claramente, el juez Roque Colón no se limitó a una lectura fría de la transcripción para llegar a la conclusión determinante de que la señora Marrero no le merecía credibilidad.
*147 Por lo tanto, concluimos que el juez sustituto sí estaba capacitado para desempeñar los deberes inherentes de pre-sidir la continuación del juicio y adjudicar la credibilidad de la señora Marrero sin violarle el debido proceso de ley. No erró al continuar el juicio de la forma como lo hizo.
III

Estándar de revisión en casos de difamación

A. Breve resumen de los elementos de difamación de un oficial público
La protección contra ataques abusivos a la honra y reputación surge del Art. II, Sec. 8 de la Constitución de Puerto Rico, LPRA, Tomo 1, además de lo provisto por el Art. 1802 de nuestro Código Civil, 31 LPRA sec. 5141, según modificado por la doctrina constitucional federal. Colón, Ramírez v. Televicentro de P.R., 175 DPR 690, 705-706, 726 (2009).(17) De esta protección surge la causa de acción de difamación, la cual conlleva la difícil tarea de balancear el alcance de la libertad de expresión y el derecho a la intimidad, ambos valores reconocidos como de alta jerarquía y de interés público en nuestro ordenamiento jurídico. Giménez Álvarez v. Silén Maldonado, 131 DPR 91, 97-98 (1992). Como es sabido, la doctrina de difamación se divide en dos vertientes, cada una con sus respectivas exigencias constitucionales, según la clasificación del demandante como funcionario o figura pública, o como persona privada.
De entrada, observamos que en el caso de autos no existe controversia sobre la clasificación de la licenciada *148 Meléndez como funcionaría pública. Nos consta que dicha designación es adecuada tomando en cuenta la posición de alta jerarquía de la licenciada Meléndez dentro del Departamento de Justicia. Véanse, por ejemplo: Soc. de Gananciales v. López, 116 DPR 112, 115-116 (1985); Rosenblatt v. Baer, 383 US 75, 85 (1966) (“[T]he ‘public official’ designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs”).
En New York Times Co. v. Sullivan, supra, el Tribunal Supremo federal detalló el equilibrio constitucionalmente exigido en casos de difamación de un funcionario público, para salvaguardar los derechos conflictivos que protegen a cada parte.(18) En síntesis, para que un funcionario público prospere en un caso de difamación tiene que probar, con prueba directa o circunstancial,(19) que la ex-presión difamatoria es falsa, que se publicó a sabiendas de que era falsa o con grave menosprecio de su falsedad o veracidad, es decir, con malicia real, y que dicha publicación le causó daños reales. Garib Bazain v. Clavell, 135 DPR 475 (1994); Villanueva v. Hernández Class, 128 DPR 618, 642 (1991); García Cruz v. El Mundo, Inc., 108 DPR 174, 178 (1978); New York Times Co. v. Sullivan, supra, págs. 279-280. Otro requisito de rango constitucional es que la expresión difamatoria se refiera a la persona del demandante de modo particular, criterio conocido en el derecho domún como ‘‘of and concerning the plaintiff”. Colón, Ramírez v. Televicentro de P.R., supra, págs. 720 y 726. *149 Véanse: Soc. de Gananciales v. El Vocero de P.R., 135 DPR 122, 128-133 (1994); New York Times Co. v. Sullivan, supra, págs. 288-292.
Para establecer malicia real en el caso de difamación de un funcionario público se requiere, además, un quantum de prueba más oneroso. La figura pública tiene que probar malicia real de manera clara, robusta y convincente. Colón, Ramírez v. Televicentro de P.R., supra, pág. 708; Villanueva v. Hernández Class, supra, pág. 643; New York Times Co. v. Sullivan, supra, págs. 285-286. De esta manera, no basta con una afirmación generalizada de que el demandado obró con malicia real, sino que tiene que establecerse con hechos específicos. García Cruz v. El Mundo, Inc., supra, pág. 180. Vale recalcar, también, que la suficiencia de prueba para establecer malicia real es una cuestión estrictamente de derecho.(20) Colón, Ramírez v. Televicentro de P.R., supra, pág. 725; Villanueva v. Hernández Class, supra, págs. 644-645; Harte-Hanks Communications v. Connaughton, 491 US 657, 685 (1988).
En Giménez Álvarez v. Silén Maldonado, supra, pág. 98, expresamos que la elevada exigencia de prueba protege en mayor grado la libertad de expresión y tiene el “resultado práctico de [...] establecer un tipo de privilegio limitado a favor de quien hace la expresión”. Véase, además, Villanueva v. Hernández Class, supra, págs. 641-642 esc. 13 (donde se expresó que desde New York Times Co. v. Sulli *150 van, supra, se ha desarrollado “una protección constitucio-nal más amplia [...] al amparo de los derechos de libertad de expresión y de prensa y a expensas del derecho a la intimidad (citas omitidas)). Con esto en mente, no es sorprendente que desde nuestra adopción de New York Times Co. v. Sullivan, supra, no hayamos emitido opinión mayoritaria alguna donde reconozcamos que un funcionario público logró probar malicia real adecuadamente.
B. Evaluación independiente del expediente
Pasamos ahora a contestar la controversia planteada sobre el estándar de revisión apelativa adecuado en un caso de difamación de un funcionario público.
En New York Times Co. v. Sullivan, supra, luego de pau-tar la nueva doctrina que rige en casos de difamación de un funcionario o figura pública, el Tribunal Supremo federal se expresó sobre su función revisora como foro apelativo y declaró:
[T]he rule is that we “examine for ourselves the statements in issue and the circumstances under which they were made to see [...] whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect” [...] We must make an independent examination of the whole record, [...] so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression. (Enfasis nues-tro y citas omitidas). Id., pág. 285.
Luego, en Bose Corp. v. Consumers Union of US, Inc., 466 US 485, 501 (1984), el Tribunal Supremo federal se reafirmó, elevando la norma de evaluación independiente en el contexto de difamación de un funcionario público a grado constitucional:
[T]he rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge.
*151 Enfatizó asimismo la importancia de dicha función revi-sora:
The requirement of independent appellate review reiterated in New York Times Co. v. Sullivan is a rule of federal constitutional law [...] It reflects a deeply held conviction that judges—and particularly Members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of “actual malice.” (Enfasis nuestro). Íd., págs. 510-511.
Aclaró, también, que una evaluación independiente no equivale a un examen de novo de toda la prueba, sino que requiere el repaso únicamente de aquellas porciones del expediente que estén relacionadas con el elemento de ma-licia real. íd., pág. 514 esc. 31.
Dicha evaluación independiente puede producir la invalidación de una determinación de malicia real hecha tanto por un Jurado —véase New York Times Co. v. Sullivan, supra, pág. 286— como por un juez de instancia —véase Bose Corp. v. Consumers Union of US, Inc., supra, págs. 511-512— si los hechos contenidos en el expediente no sostienen esta determinación.
Este estándar de revisión, aunque ciertamente más ri-guroso que la regla que impera en nuestra jurisdicción de no intervenir con la apreciación de la prueba hecha por los tribunales de instancia a menos que sea claramente erró-nea,(21) es compatible con la norma de deferencia hacia el *152 foro primario en cuanto a determinaciones de credibilidad de los testigos, tal como mencionáramos anteriormente. El Tribunal Supremo federal armonizó estas dos pautas, en el contexto de las Reglas de Procedimiento Civil federal, de la manera siguiente:
[Federal Rule of Civil Procedure] 52(a) commands that “due regard” shall be given to the trial judge’s opportunity to observe the demeanor of the witnesses; the constitutionally based rule of independent review permits this opportunity to be given its due. Bose Corp. v. Consumers Union of US, Inc., supra, págs. 499-500.
El Tribunal Supremo federal señaló con aprobación que en Bose Corp. v. Consumers Union of US, Inc., supra, el foro apelativo intermedio rehusó cuestionar las determina-ciones de credibilidad del juez de instancia, dejando que el juzgador de hechos evaluara el peso que ameritaba el comportamiento (“demeanor”) de los testigos. Íd., pág. 500.
El Tribunal Supremo federal volvió a atender este asunto en Harte-Hanks Communications v. Connaughton, supra, confrontando directamente la pregunta de cómo debe evaluarse independientemente un expediente que contiene testimonios orales conflictivos, además de una determinación de credibilidad, situación similar al caso de autos. Citando Bose Corp. v. Consumers Union of US, Inc., supra, y New York Times Co. v. Sullivan, supra, el Tribunal reiteró:
In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full. Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the “opportunity to observe the demeanor of the witnesses,” the reviewing court must “examine for [itself] the statements in issue and the circumstances under which they were made to see [...] whether they are of a character which the principles of the First Amendment [...] protect. (Énfasis nuestro, corchetes en el original y citas omitidas). Harte-Hanks Communications v. Connaughton, supra, pág. 688.
*153 Como parte de su análisis, señaló que el mero hecho de que el Jurado encontrara que una versión de los hechos merecía credibilidad, mientras que la otra versión —la que se publicó por el periódico demandado— era falsa, no cons-tituía de por sí prueba clara y convincente de que el perió-dico actuó con malicia real. Harte-Hanks Communications v. Connaughton, supra, pág. 681. Sin embargo, después de revisar mesuradamente la totalidad del expediente y a base de los hechos que el Jurado tuvo que haber aceptado como ciertos para llegar a su veredicto, junto con la prueba no controvertida, el Tribunal Supremo federal encontró que, efectivamente, se había probado malicia real. íd., págs. 689-691.(22)
El tratadista Rodney A. Smolla describe el procedi-miento establecido por el Tribunal Supremo federal de la manera siguiente:
In engaging in its own independent review of the record, the Court held, it would confine itself to only those issues that the jury must have found in order for it to return a verdict. When those findings are considered along with the undisputed evidence, the Court held, the conclusion that actual malice existed was supported by clear and convincing evidence. (Énfasis en el original). R.A. Smolla, Law of Defamation, 2da ed., Minnesota, Ed. Thomson Reuters, 2011, Vol. 2, pág. 12-77.(23)
En fin, del marco delineado por la jurisprudencia del más alto Foro federal surge que los tribunales apelati *154 vos están obligados a sopesar por sí mismos, a través de una evaluación independiente de la prueba, si se estableció malicia real de manera clara y convincente en los casos de difamación de un funcionario público. La única deferencia reservada para el juzgador de los hechos en dicha tarea está atada a las determinaciones de credibilidad de los tes-tigos, como fuera determinado en Bose Corp. v. Consumers Union of US, Inc., supra, y en Harte-Hanks Communications v. Connaughton, supra. P.D. Driscoll, The Scope of Independent Appellate Court Review in Public Person Libel Cases, 14 Loy. L.A. Ent. L.J. 257, 274 (1993-1994) (“[T]he Harte-Hanks decision makes clear that lower court findings of fact anchored in credibility determinations must be accepted unless clearly erroneous [...]” (énfasis en el original)). Sin embargo, esas determinaciones de credibili-dad no obligan al resultado final del tribunal revisor, sino que se consideran junto con el resto de la prueba.
Si bien es cierto que en nuestras opiniones hemos alu-dido indirectamente al estándar de revisión establecido por el Tribunal Supremo federal,(23) hasta ahora no hemos de-finido o delineado de manera directa el mandato constitucional de evaluación independiente de toda la prueba.(24) Hoy llenamos ese vacío.
En el caso de autos, la señora Marrero y la prensa ale-gan que el Tribunal de Apelaciones ignoró su deber de rea-lizar una evaluación independiente de la totalidad del ex-pediente para comprobar que se probó malicia real con prueba clara y convincente. Además, argumentan que dicho foro erróneamente optó por brindarle deferencia a las *155 determinaciones de hechos del Tribunal de Primera Ins-tancia, contraviniendo de esta manera un mandato constitucional. La prensa específicamente aduce que el Tribunal de Apelaciones no cumplió con su deber, ya que ig-noró la prueba eximente de malicia real que trajeron a su atención.(25) Por otro lado, la señora Marrero basó su argu-mento en que el Tribunal de Apelaciones describió su fun-ción revisora conforme la regla general de conceder al Tribunal de Primera Instancia gran deferencia en cuanto a las determinaciones de hechos.
Debido a que los apelantes no probaron que medió pre-juicio, parcialidad o error manifiesto, el Tribunal de Apela-ciones explicó que no le “correspond [ía] sustituir las deter-minaciones de hechos que formuló el [Tribunal de Primera Instancia] por unas que, cuando más, reflejarían una posi-bilidad alterna en cuanto a la interpretación de la prueba del caso”, y concluyó que, por lo tanto, evaluaría los seña-lamientos de error “a base del cuadro fáctico plasmado en la sentencia del foro apelado”. Caso Núm. AC-2007-66, Pieza 4, Apéndice de la Apelación civil, pág. 1647. Sin embargo, contrario a lo que alega la señora Marrero, en su contexto este pronunciamiento revela que el Tribunal de Apelaciones se refirió únicamente a su revisión de la deter-minación del Tribunal de Primera Instancia a los efectos de que la señora Marrero mintió, hecho que tenía como base testimonios encontrados. En el párrafo justo antes del pronunciamiento objetado por la señora Marrero, el Tribunal de Apelaciones resumió que “ante el [Tribunal de Pri-mera Instancia] —y, en específico, ante el Juez Roque Co-lón— [se] desfiló aquella prueba testifical necesaria para que el foro sentenciador dictaminara sobre cuál de las ver-siones conflictivas de las partes le merecía credibilidad”. Id., pág. 1646. El Tribunal de Apelaciones no erró al conce- *156 der tal deferencia. Por cierto, el foro apelativo intermedio afirmó más adelante su “obligación de cerciorar [se] de que la malicia real del demandado surja claramente de los autos”, id., pág. 1652, indicando el estándar de revisión adecuado.
Sin embargo, irrespectivamente del resultado de la eva-luación independiente del Tribunal de Apelaciones, como foro revisor tenemos nuestro propio deber de determinar si, a base del voluminoso expediente de autos, sobresale prueba clara y convincente de malicia real. Con el beneficio de la guía expuesta en Harte-Hanks Communications v. Connaughton, supra, brindaremos la debida deferencia a las determinaciones de credibilidad del Tribunal de Pri-mera Instancia por ser correctas. Conjuntamente con los hechos no controvertidos, examinaremos si las circunstan-cias que rodearon las alegadas expresiones difamatorias realmente carecen de la protección constitucional que nor-malmente poseerían.
Aclaradas las controversias procesales presentadas en los recursos, atenderemos la aplicabilidad del privilegio es-tatutario del cual gozan las comunicaciones hechas en el curso de un procedimiento autorizado en ley antes de eva-luar los méritos de la acción por difamación en lo referente a las tres partes demandadas.
IV

Privilegio de comunicaciones vertidas como parte de un procedimiento autorizado por ley

En Giménez Álvarez v. Silén Maldonado, supra, págs. 98-100, notamos que la doctrina que rige en materia de difamación, en el interés de llegar a un balance justo entre los derechos constitucionales que se encuentran en juego, establece ciertas exigencias que crean mayores proteccio-nes hacia la libertad de expresión en contraposición al de- *157 recho a la intimidad. íd., pág. 98. Destacamos, dentro de dicha tendencia, el privilegio limitado reconocido por algu-nos tribunales a favor de quien hace la expresión en el contexto de un procedimiento judicial.
Una de las situaciones en las que generalmente se reconoce inmunidad es durante los procedimientos judiciales. La inmu-nidad no se limita a las expresiones que pueda efectuar un juez, sino que incluye las expresiones de los testigos y de los abogados. Debido al interés público en la administración de la justicia y en permitir un amplio y libre acceso a los tribunales, la inmunidad se extiende también a lo expresado con relación a la controversia, ya sea a través de las alegaciones, en decla-raciones juradas o en corte abierta. Id., págs. 98-99.
En Puerto Rico, este privilegio está recogido en la See. 4 de la Ley de Libelo y Calumnia, 32 LPRA see. 3144, la cual establece que “[n]o se tendrá por maliciosa, ni como tal se considerará la publicación que se hace en un procedimiento legislativo, judicial, u otro procedimiento cualquiera autorizado por la ley”.(26) De este pasaje surge la protección que brindamos a toda expresión vertida en el curso de un procedimiento de carácter legal, aunque sea falsa o difamatoria. De hecho, el estatuto no distingue entre diferentes categorías de oradores, sino que ofrece una protección global para todo lo allí expresado.
Este privilegio aplica a toda comunicación necesaria, habitual o útil en la preparación o el desarrollo de un caso pendiente. D.A. Elder, Defamation: A Lawyer’s Guide, Illinois, Ed. Clark Boardman Callaghan, 2003, pág. 2-73. Por cierto, una demanda y las manifestaciones allí incluidas constituyen una publicación en el contexto de un procedimiento judicial, por lo que no se tendrán por maliciosas, siempre y cuando guarden algún tipo de relación con el asunto en controversia. Giménez Álvarez v. Silén Maldo *158 nado, supra, págs. 99-100. Sin este privilegio, los abogados estarían expuestos a causas de acción por difamación por cualquier expresión hecha en el curso de la representación de sus clientes que resultara falsa.(27) Ello tendría el efecto probable de obligar una litigación amplia y vigorosa por temor a ser perseguido luego con un pleito de libelo. Igual-mente, representaría un conflicto con su deber ético de ha-cer todo lo posible para lograr que se imparta justicia. Smolla, op. cit, pág. 8-9. A la larga, los abogados serían cautelosos en el proceso de aceptar casos, lo que también afectaría el libre acceso del público a los tribunales.
Esta norma está recogida por la regla mayoritaria en el derecho común estadounidense, resumida de la manera si-guiente:
Under the undoubted consensus view of the authorities an attorney is absolutely privileged(28) as to defamatory statements during civil, criminal and administrative quasi-judicial proceedings “in the conduct of the litigation” and for any defamation contained in pleadings or petitions, motions, briefs, communiques and other documents filed therein which have “some relation” to the proceedings [...] This protection for attorney advocates reflects the public policy that it is essential that attorneys “be free to act on their own best judgment in prosecuting or defending without fear of later having to defend a civil action for defamation [...]” (Escolios omitidos). Elder, op. cit, págs. 2-70 a 2-72. Véase Smolla, op. cit., págs. 8.1-8.2.
En el caso de autos, el licenciado Santiago Rivera cursó *159 cinco cartas(29) al entonces Secretario de Justicia durante el curso de la investigación instada por el Departamento de Justicia sobre el alegado hostigamiento sexual del que fue víctima la señora Marrero. Estas cartas imputaron falsa-mente una conducta ilícita por parte de varios empleados de dicha entidad, alegando que estos se organizaron con el propósito de encubrir información para que la licenciada Meléndez saliera favorecida en la investigación instada en su contra.(30) Posteriormente, el licenciado Santiago Rivera relató el contenido de las cartas al señor Purcell para que se publicaran en varios reportajes de El Vocero. De esta manera, el licenciado Santiago Rivera se convirtió en una fuente de la prensa, supliendo material para generar la publicación de más artículos relacionados con el alegado encubrimiento de la querella por hostigamiento sexual pre-sentada por su dienta.
Contrario al Tribunal de Primera Instancia, el Tribunal de Apelaciones resolvió que al amparo de la See. 4 de la Ley de Libelo y Calumnia, supra, “[t]oda vez que las cartas en cuestión fueron remitidas como parte del proceso que llevaba a cabo el Secretario de Justicia en el descargo de su deber legal de investigar la querella de la [señora] Ma-rrero, el [licenciado] Santiago Rivera no puede ser deman-dado por las expresiones vertidas en ellas”. Caso Núm. AC-2007-66, Pieza 4, Apéndice de la Apelación civil, pág. 1656. Diferimos de dicha determinación en vista de la totalidad de los hechos.
Indudablemente, la investigación interna ejecutada por el Departamento de Justicia sobre los alegados actos de hostigamiento sexual representa un “procedimiento autorizado por la ley”. Véanse: 29 LPRA sec. 155; Smolla, op. cit., Sec. 8:15; Elder, op. cit., págs. 2-33 a 2-36. También es evidente que las cartas se enviaron al Secretario de Justi- *160 cia con la intención de que formaran parte del expediente del procedimiento en curso, y que la información comuni-cada en estas guardaba una relación directa con el asunto en controversia. Por lo tanto, dado que se reunieron todos los elementos que fundamentan el mencionado privilegio judicial, las expresiones del licenciado Santiago Rivera contenidas en las cartas dirigidas al Secretario de Justicia, efectivamente, gozaban de la inmunidad estatutaria contra un pleito de difamación.(31)
Sin embargo, el licenciado Santiago Rivera no se limitó a expresar sus aseveraciones dentro de la esfera de la in-vestigación interna del Departamento de Justicia, sino que deliberadamente tomó acciones para que el contenido de las cartas fuera difundido al público a través del periódico. De aquí surge la interrogante ante nos: dadas estas cir-cunstancias, ¿las expresiones siguen gozando de la inmu-nidad que adquirieron por formar parte de un procedi-miento autorizado por ley? La determinación del Tribunal de Apelaciones y los argumentos expuestos por el licen-ciado Santiago Rivera contestan en la afirmativa, mientras que la licenciada Meléndez argumenta lo contrario.
Aunque esto representa una controversia novedosa ante este Foro, no lo es en otras jurisdicciones. Según el trata-dista David Eider, existe una distinción importante entre el hecho de que un abogado se comunique directamente con la prensa con relación a un procedimiento pendiente, y el que la prensa decida publicar por su propia cuenta in-formación ya presentada en el curso de un procedimiento legal.
The cases have “almost universally found” that oral and written publications to the media preliminary to, during the course of, or following a judicial proceeding or a filing therein are “not within the sphere of activities which judicial immu *161 nity was designed to protect” but are made to a mere “concerned observer” having no sufficient connection to the proceedings and whose receipt thereof does not “enhance the judicial function.” As to attorneys, these extrajudicial reiterations do not constitute actions of an attorney “while performing his functions as such” and are inconsistent with ethical duties imposed on him or her as a member of the bar [...]
[However, t]he [...] privilege is not forfeited by the mere fact that the filer of a document has a mere intent, hope or expectation that the media will republish it, or because the press does in fact report such a filing. Some affirmation by defendant other than the initial, absolutely privileged publication is required. Of course, another privilege may apply to subsequent dissemination of judicial or quasi-judicial determinations [...] (Escolios omitidos). Elder, op. cit., págs. 2-87 a 2-91. Véanse: Smolla, op. cit., Sec. 8:17; Cortés Portalatín v. Hau Colón, 103 DPR 734, 739 (1975), citando a Quiñones v. J.T. Silva Banking & Commercial Co., 16 DPR 696 (1910)) (“Se pierde la inmunidad si [...] el actor le imparte publicidad ex-cesiva al asunto; o si el actor se mueve por motivos impropios. [Pero e]l hecho de que otras personas escuchen o lean inciden-talmente una comunicación hecha de modo razonable no anula el privilegio” (citas omitidas)).
Resolvemos hoy que, aunque a una expresión se le haya extendido inmunidad por haberse ofrecido como parte de un procedimiento legal, ello no garantiza que esta ex-presión sea privilegiada en publicaciones subsiguientes hechas fuera del foro que atiende el asunto. Wagner v. Miskin, 660 N.W.2d 593 (N.D. 2003); World Wrestling Federation Intertainment v. Bozell, 142 F.Supp.2d 514, 534 (S.D. NY 2001). Opinamos, además, que las comunicaciones hechas a la prensa por un abogado, una parte, un testigo u otro participante en un proceso legal nunca forman parte de un procedimiento legal. Las conversaciones con la prensa no son publicaciones hechas en un procedimiento legislativo, judicial u otro procedimiento cualquiera autorizado por la ley, tal como lo requiere expresamente la See. 4 de la Ley de Libelo y Calumnia, supra. Por el contrario, son comentarios realizados en un espacio que abarca más allá de lo que comprende un procedimiento legal y no merecen tratamiento preferente ante una acción de difamación.
*162 Encontramos que esta delimitación no solo concuerda con la interpretación literal de la See. 4 de la Ley de Libelo y Calumnia, supra, sino que también preserva el propósito del privilegio sin ampliarlo a un extremo que facilite la perpetuación de declaraciones difamatorias. Específica-mente, queremos evitar una situación como la que hoy te-nemos, donde una publicación falsa pero privilegiada, he-cha en el transcurso de un procedimiento legal, se repita ilimitadamente, maculando el prestigio y la reputación de una persona que se encuentra sin remedio para los daños sufridos.
Cabe señalar que nuestra determinación de ninguna manera restringe el derecho de libertad de palabra de cual-quier abogado, parte o testigo cuando estén fuera del con-texto de un procedimiento legal en curso. Éstos siguen po-seyendo el derecho de expresarse como y a quien quieran. La regla que hoy adoptamos simplemente establece que si discuten el tema objeto del procedimiento legal a terceros que se encuentran fuera de éste, subsiguientemente no po-drán invocar este privilegio en ese ámbito. Véase Smolla, op. cit., pág. 8-15.
Así pues, al comunicarse con un reportero de El Vocero —a diferencia de las cartas que envió al Secretario de Jus-ticia— el licenciado Santiago Rivera no estaba preparando, desarrollando ni avanzando los intereses de su dienta, la señora Marrero, dentro de los parámetros de un procedi-miento legal. Por consiguiente, erró el Tribunal de Apela-ciones al determinar que las expresiones que el licenciado Santiago Rivera comunicó al señor Purcell estaban prote-gidas por el privilegio de una comunicación hecha en un procedimiento autorizado en ley.
De igual manera, la señora Marrero tampoco está cobi-jada bajo este privilegio legal. Aun asumiendo, arguendo, que la señora Marrero se querelló verbalmente con el fiscal Goyco en su primera reunión con éste el 19 de junio de 1991, de su alegato y testimonio surge una larga lista de *163 personas a quienes la señora Marrero les comentó su difícil relación con la licenciada Meléndez, con ejemplos específi-cos de cómo su jefa se dirigía hacia ella, antes de esa fecha. Esto es, previo a que se hubiese iniciado un procedimiento autorizado en ley. Por lo tanto, forzosa es la conclusión de que a esas expresiones difamatorias ciertamente no se les puede extender el privilegio legal.
Aun si designamos el 15 de octubre de 1991 —fecha cuando el fiscal Goyco recibió por primera vez una queja escrita por la señora Marrero— como el inicio del procedi-miento legal en torno a la investigación de hostigamiento sexual, esta comunicación tampoco gozaría del privilegio. Poco después de cursar la carta, la señora Marrero consin-tió a una entrevista con el señor Purcell, quien le informó que interesaba reportar sobre el asunto en el periódico. En esa reunión, la señora Marrero relató al periodista los de-talles de varios incidentes no incluidos en su carta al fiscal Goyco. Sus extensas y voluntarias comunicaciones con el señor Purcell sirvieron de fuente principal para la serie de artículos de El Vocero; no se hicieron como parte del proce-dimiento legal que apenas comenzaba. Por lo tanto, las ex-presiones de la señora Marrero tampoco encuentran inmu-nidad al amparo del privilegio legal y están sujetas al escrutinio que conlleva una demanda por difamación.
V

Falta de referencia específica a la demandante

Enfocándonos una vez más en las expresiones del licenciado Santiago Rivera dirigidas al Secretario de Justicia, que luego fueron publicadas por El Vocero, la próxima controversia plantea si estas cumplieron con el requisito de referencia específica a la persona de la licenciada Meléndez.
Como mencionamos anteriormente, es un prerrequisito de dimensión constitucional y piedra angular de todo pleito *164 de difamación que las manifestaciones alegadamente difa-matorias identifiquen específicamente al reclamante. Colón, Ramírez v. Televicentro de P.R., supra, págs. 720-721; Soc. de Gananciales v. El Vocero de P.R., supra, pág. 128; New York Times Co. v. Sullivan, supra, pág. 288. “En el umbral de cada acción por difamación, la parte demandante tiene que demostrar que en algún sentido definitivo y directo es la persona contra quien la expresión difamatoria se dirige, esto es, tiene que probar que es quien sufre el daño a su reputación”. Colón, Ramírez v. Televicentro de P.R., supra, pág. 722 esc. 28 (citando 1 Smolla, Law of Defamation, Supl. 2008, Sec. 4:40:50). Este criterio limita el derecho a demandar a aquellos que realmente son objeto directo de críticas e impide reclamaciones por difamación vicaria. Soc. de Gananciales v. El Vocero de P.R., supra, págs. 128-129.
Cabe señalar que este requisito no exige que el deman-dante sea mencionado por nombre y apellido ni que cada lector reconozca que el demandante es el objeto de difamación. Colón, Ramírez v. Televicentro de P.R., supra, pág. 722 esc. 28; Elder, op. cit, págs. 1-136. En su lugar, se mide el cumplimiento del elemento de identificación personal de acuerdo con lo que los receptores de la noticia razo-nablemente entendieron, irrespectivo de si la asociación que la audiencia hace con el demandante fue intencional o no. Colón, Ramírez v. Televicentro de P.R., supra, pág. 722 esc. 28, citando 1 Smolla, Law of Defamation, Supl. 2008, Sec. 4:40:50.
A través de su carta de 15 de noviembre de 1991 diri-gida al Secretario de Justicia, el licenciado Santiago Rivera comunicó que su dienta había recibido información sobre la celebración de dos reuniones distintas en las que estu-vieron presentes varios fiscales, pero sin mencionar la par-ticipación de la licenciada Meléndez en ellas.(32) Indicó que *165 el propósito de estas reuniones fue discutir los hechos con-cernientes a la querella de hostigamiento sexual sometida por la señora Marrero y las versiones que debían sostener al respecto. Sugirió que estas reuniones tenían “el propó-sito de encubrir, distorsionar, sugerir o acomodar testimo-nios que [iban] a ser eventualmente vertidos, bajo juramento”, que presentaban una interferencia indebida con la investigación y “que su propósito [era] evitar que aflore la verdad de lo ocurrido”. Caso Núm. CC-2007-827, Apéndice de la Petición de certiorari, pág. 137. También indicó que los fiscales Goyco, José Santiago Martínez (fiscal Santiago Martínez) y Emilio Duprey Tacáronte (fiscal Duprey), ade-más de la Sra. Luz E. Machuca y otros funcionarios de la Fiscalía de San Juan, tenían “conocimiento directo de los hechos que motivan la investigación en proceso”. Íd. Luego, en su carta de 16 de marzo de 1992, indicó que su dienta temía que el Departamento de Justicia “se propon [ía] encubrir y exonerar la actuación ilegal” del fiscal Goyco y de la licenciada Meléndez, entre otros funcionarios. Íd., pág. 148.(33)
El Tribunal de Apelaciones concluyó que estas declara-ciones no sustentaban la responsabilidad civil del licen-ciado Santiago Rivera. Explicó su razonamiento de la ma-nera siguiente:
Según lo ha sostenido la demandante desde los comienzos del pleito, la responsabilidad civil del letrado por los daños qne sufrió la [licenciada] Meléndez surge de las expresiones verti-das en varias cartas que éste remitió al Secretario de Justicia. En esas misivas, alegó que funcionarios de dicha agencia pre-tendían encubrir el hostigamiento sexual del que alegada- *166 mente fue víctima su cliente y procurar así que la [licenciada] Meléndez saliera airosa de la investigación interna. Además, señaló que el proceso estaba viciado de tal manera que peiju-dicaba los intereses de su cliente.
Pero aun si la información vertida en esas cartas fuera falsa y difamatoria, y el [licenciado] Santiago conociese de su false-dad, ello sería insuficiente en derecho para responsabilizarle por los daños sufridos por la apelada. Al referirse a las gestio-nes que alegadamente hicieron funcionarios del Departa-mento de Justicia para procurar que la [licenciada] Meléndez fuera exonerada por la agencia, el [licenciado] Santiago le[s] imputó conducta ilícita a personas que no son parte en este pleito.
[...] Conforme a la doctrina de referencia específica, aun si asumiéramos, arguendo, que las alegaciones del [licenciado] Santiago Rivera de que compañeros de la [licenciada] Melén-dez hicieron gestiones ilícitas para procurar que ésta saliera favorecida del proceso investigativo de la agencia fueron fal-sas, difamatorias, y hechas con malicia real, la apelada no tendría una causa de acción por dichas imputaciones. Toda vez que los funcionarios a los que se refieren las mismas no for-man parte de este pleito, no procede compeler al [licenciado] Santiago a reparar daño alguno. Caso Núm. AC-2007-67, Pieza 4, Apéndice de la Apelación, págs. 1654-1655.
La licenciada Meléndez disputa esta determinación razonando que "no es posible imputar un encubrimiento sin que exista referencia específica a los hechos y al sujeto protegido”. Caso Núm. AC-2007-66, Pieza 4, Apéndice de la Apelación civil, pág. 1728. Arguye que el licenciado Santiago Rivera sí se refería a ella directamente, dado que “[i]mputarle a una persona que otras personas se confabulan para ‘amapuchar’ [su investigación] es idéntico a decir que la persona imputada cometió los hechos por los que se le investiga”. (Enfasis suprimido). Caso Núm. AC-2007-66, Pieza 4, Alegato de la peticionaria de 3 de enero de 2008, pág. 19.
La licenciada Meléndez entiende, además, que su caso es análogo al de González Martínez v. López, 118 DPR 190 (1987), donde el demandado declaró, entre otras cosas, que " ‘[e]l señor Alcalde de Aguada [le] tendría que dar los pía- *167 nos de la casa de su mamá en la Calle San Narciso porque eso es obra de su gobierno’”. íd., pág. 193. Confirmamos en ese caso que la madre del alcalde de Aguada —la deman-dante— poseía capacidad jurídica para instar su acción contra el declarante, pues se le había imputado directa y falsamente que adquirió su casa con fondos públicos. íd., pág. 197. Aunque la aparente intención de la recriminación fue hacerle daño al Alcalde de Aguada, también se perju-dicó personal y específicamente la reputación, integridad y honradez de la madre de éste.
A pesar de sus intentos, la licenciada Meléndez no nos convence de que los hechos de su recurso son semejantes a los de González Martínez v. López, supra. En ese caso, el mensaje que claramente se transmite es que la señora González Martínez vive en una residencia construida ilícitamente, la cual fue construida gracias a su hijo, el Alcalde de Aguada. Indudablemente, esa expresión se refería directamente a la persona de la demandante. En comparación, una lectura de la carta del licenciado Santiago Rivera desglosa los supuestos esfuerzos realizados por un grupo de funcionarios del Departamento de Justicia para intervenir en la investigación de la querella presentada por la señora Marrero. El enfoque de esa comunicación fue el hecho de que varios empleados estaban deliberadamente afectando la pureza de la investigación interna en curso. La licenciada Meléndez no fue incluida en la lista de nombres como partícipe en el esquema. Tampoco se hicieron aseveraciones afirmativas sobre su culpabilidad de haber hostigado a la señora Marrero. Por ende, ni la licenciada Meléndez ni las imputaciones de la señora Marrero —que constituyen la médula de la presente demanda— figuraron como objeto directo de las reclamaciones incluidas en las cartas del li-cenciado Santiago Rivera. El nombre de la licenciada Meléndez se mencionó por el solo hecho de que la comunicación era pertinente a la investigación que se cursaba sobre su alegado comportamiento hacia la señora Marrero. Úni- *168 camente una inferencia tenue e incierta llevaría a un lector a suponer que lo que el licenciado Santiago Rivera real-mente insinuaba era que el hecho de que sus compañeros fiscales estuviesen conspirando entre ellos significaba que la licenciada Meléndez ciertamente hostigó a su secretaria.
La presencia de un nombre en una expresión, sin más, no es suficiente para sustentar que la misma constituye una referencia a dicha persona que genera la reparación de un daño. Estas circunstancias no satisfacen adecuadamente la doctrina de referencia específica. No encontramos prudente flexibilizar este requisito de rango constitucional, el cual busca velar por que cada acción por difamación sea realmente personal y no fundamentada en manifestaciones no específicas, que los reclamantes subjetivamente entienden que los perjudican. Colón, Ramírez v. Televicentro de P.R., supra, págs. 721-723.
Por lo tanto, determinamos que el Tribunal de Apelacio-nes llegó a la conclusión correcta en cuanto a la falta de responsabilidad del licenciado Santiago Rivera por sus co-municaciones a El Vocero, puesto que estas no se referían específicamente a la licenciada Meléndez.(34)
VI

Malicia real

Atenderemos ahora las expresiones alegadamente difamatorias de la señora Marrero y de la prensa. *169 Sin dudas, desde lo resuelto en New York Times Co. v. Sullivan, supra, se han fortalecido las garantías constitucionales de libertad de expresión y de prensa, ya que “no es difamatoria la publicación, en el ejercicio de dicha[s] libertad [es], de un informe falso o de comentarios injustificados concernientes a la conducta oficial de un funcionario público, a menos que la información fuere publicada a sabiendas de que era falsa o con grave menosprecio de si era falsa o no”. García Cruz v. El Mundo, Inc., supra, pág. 178, citando a Torres Silva v. El Mundo, Inc., 106 DPR 415 (1977). De acuerdo con ese marco legal, tenemos el deber de verificar si surge de nuestro examen independiente del expediente alguna evidencia clara y convincente de que la licenciada Meléndez probó la existencia de malicia real de parte de la señora Marrero y la prensa.
A. Las publicaciones de la señora Marrero

Versión de la señora Marrero sobre los hechos

La señora Marrero testificó que desde su primera visita al CMID, la licenciada Meléndez comenzó a hacerle obser-vaciones que la hacían sentir incómoda, tales como lo lindo que tenía su pelo, los “troncos de piernas” que tenía, que le gustaba verla maquillada y arreglada, y que no se debía poner su chaqueta porque se veía “chulísima” sin ella puesta. En una ocasión le preguntó qué hacía para enchu-lar a los hombres. Expresó también que en varias ocasio-nes la licenciada Meléndez le tocaba el pelo y a veces le acariciaba el cuello. Testificó que este tipo de comporta-miento duró desde septiembre de 1990 hasta después de abril de 1991.
Relató, además, que el 21 de diciembre de 1990, día de la fiesta de Navidad del Departamento de Justicia, ella y su compañera de trabajo, la Sra. Mayda Alicea (señora Ali-cea) regalaron a su jefa un juego de ropa interior —un “set” de panties y brasier— y maquillaje. La señora Marrero tes- *170 tífico que la licenciada Meléndez les dijo que tendría que guardarlo para una ocasión especial, mirándola fijamente al decirlo. También alegó que ese mismo día, mientras sa-caba unas fotocopias al mediodía, la licenciada Meléndez se le acercó por detrás y le agarró una nalga, comentando que estaba engordando.
Otro supuesto incidente ocurrió en abril de 1991, en la Semana de las Secretarias. Las señoras Marrero y Alicea salieron a almorzar con el fiscal Rafael A. Díaz Díaz (fiscal Díaz) y no regresaron a la oficina hasta tarde. La señora Marrero cuenta que la licenciada Meléndez las regañó por la tardanza, dando puños en el escritorio, y comentó que la demora se debió a una relación íntima entre ellas y el fiscal Díaz.
Ante esta situación, la señora Marrero indicó que, para fines de mayo de 1991, informó todo lo sucedido al Ledo. Roberto Buono Grillasca (licenciado Buono) cuando este le preguntó sobre su relación con la licenciada Meléndez. El licenciado Buono corroboró que la señora Marrero le des-cribió los comentarios de la licenciada Meléndez sobre lo lindo que tenía el pelo, lo guapa que era y que en una ocasión le agarró la nalga. Fue el licenciado Buono quien sugirió a la señora Marrero que lo que ella le relataba era hostigamiento sexual.
La señora Marrero también testificó que expresó a los fiscales Santiago Martínez y Duprey, entre otros,(35) sobre la situación hostil en que se encontraba con la licenciada Meléndez y los actos de hostigamiento sexual.

Versión de los hechos de la licenciada Meléndez y otros

La licenciada Meléndez, por su parte, negó que hubiese tocado a la señora Marrero y, mucho menos, en la forma *171 como ella lo describió. Testificó, además, que jamás se hu-biera dirigido verbalmente a la señora Marrero de esa ma-nera porque no es su estilo de ser ni de hablar.
La licenciada Meléndez describió en su testimonio que la señora Marrero y su compañera de trabajo, la señora Alicea, tenían una mala relación con el resto del personal de la oficina, al extremo de que el personal de Secretaría evitaba pasar frente el escritorio de la señora Marrero para no tener ningún contacto con ella.
El Ledo. Luis Rivera Martínez (licenciado Rivera Martí-nez), Subdirector del CMID, testificó que había conflictos y diferencias bastante marcadas entre las empleadas, y que “se maltrataban a veces hasta verbalmente”. La fiscal Lora también corroboró que el ambiente en el CMID era hostil entre las taquígrafas y la señora Marrero.
Aunque varios de los directores anteriores del CMID testificaron en cuanto al excelente trabajo de la señora Marrero,(36) la licenciada Meléndez sintió que esta demostraba cierta resistencia hacia ella desde su llegada al CMID por-que representaba una figura de autoridad a la que tenía que responder. La licenciada Meléndez supuso que a la se-ñora Marrero no le agradó que la hubiese despojado de varias responsabilidades administrativas que había adqui-rido bajo el director anterior que le daban “cierta autoridad sobre el resto de los empleados”. Describió que la señora Marrero resentía que se le dieran instrucciones, contestán-dole “que no la ajorara”, y que también tenía que tolerar sus “actitudes arrogantes, llegadas tarde, palabras duras de parte de ella a veces hacia mí, a veces hacia otro personal”.
Un ejemplo de la insubordinación que demostraba la señora Marrero ocurrió el mismo 21 de diciembre de 1990, *172 fecha de la fiesta de Navidad del Departamento de Justicia. Ese día, las señoras Marrero y Alicea llegaron tarde al trabajo porque se habían ido a arreglar por la mañana. Después de llamarles la atención por la tardanza, al mediodía la licenciada Meléndez pidió a la señora Ma-rrero que terminara de preparar un memorando que es-taba pendiente. La señora Marrero se molestó y le dijo que el memorando no tenía ninguna urgencia, dado que ya ha-bían cesado las funciones de la Oficina Central del Depar-tamento de Justicia por las actividades de la fiesta navideña. Al comentarle de forma inmadura a la señora Alicea que ya no podría ir a la fiesta debido al trabajo asig-nado, la licenciada Meléndez le dijo que no se preocupara por lo pedido y que se fuera a la actividad.
En cuanto al regalo de Navidad de ropa interior que recibió de la señora Marrero, la licenciada Meléndez testi-ficó que le sorprendió mucho porque, en su opinión, no era usual para una mujer hacer este tipo de regalo a otra mujer. Admitió que probablemente dijo algo igual a lo ex-presado por la señora Marrero —de que lo guardaría para usarlo en una ocasión especial — , pero sin el comentario adicional “aunque tenga que esperar”, como relató el perió-dico, y sin mirar a la señora Marrero de la manera como esta lo describió.
También negó que agarrara el glúteo de la señora Marrero. En su lugar, la licenciada Meléndez recuerda que ese día le comentó a la señora Marrero que su falda estaba demasiada apretada e inapropiada para el trabajo.
El “incidente mayor” en el que se relaciona a la licen-ciada Meléndez sucedió la Semana de las Secretarias en abril de 1991, día cuando las señoras Marrero y Alicea lle-garon tarde de su almuerzo con el fiscal Díaz. La licenciada Meléndez testificó que la reacción de la señora Marrero, cuando le reprochó por la tardanza en regresar a la oficina, fue explosiva y que fue esta última quien dio puños en el escritorio y se puso histérica. Declaró que ese suceso, ade- *173 más de otros incidentes y actitudes arrogantes por parte de la señora Marrero, le restaron su confianza en ella y la motivaron a indagar sobre la posibilidad de transferirla fuera del CMID.
La licenciada Meléndez indicó que le habló a su amigo, el licenciado Buono, sobre las dificultades que tenía con su secretaria y que éste se ofreció a conversar con la señora Marrero para solucionar el problema, lo cual hizo. El licen-ciado Buono testificó que nunca le informó a la licenciada Meléndez los detalles de lo que la señora Marrero le había relatado, los cuales le sorprendieron grandemente, y re-husó declarar en el juicio sobre si le creyó a la señora Ma-rrero o no.
Por otro lado, el fiscal Santiago Martínez negó que la señora Marrero le mencionara algo relacionado con el ale-gado hostigamiento sexual, aunque sí recuerda que le ha-bía comentado que tenía problemas con su supervisora.
Otro hecho relevante es que antes de irse de vacaciones en mayo o junio de 1991,(37) la licenciada Meléndez impartió instrucciones al Subdirector del CMID para que no re-comendara que la plaza de la señora Marrero fuera reclasificada a Secretaria Legal II, porque no le parecía que esta mereciera el ascenso. Por otro lado, durante el juicio también se leyó para el expediente una sección de la deposición de la madre de la señora Alicea, donde esta declaró que la señora Marrero le había dicho que no soportaba a la licenciada Meléndez y le declaró lo siguiente: “A nombre de Martha Marrero, la Fiscal no va a seguir siendo Fiscal y me la va a tener que pagar como Martha Marrero que me llamo”.

El traslado y secuela

Los eventos siguientes constan del conjunto de testimo-nios presentados durante el juicio. El 7 de junio de 1991 la *174 señora Marrero visitó la oficina del fiscal Goyco para soli-citar un traslado, preferiblemente a la Fiscalía de San Juan, porque no se sentía a gusto trabajando con la licen-ciada Meléndez.
La señora Marrero admitió que en esa ocasión no le mencionó que fuese víctima de hostigamiento sexual por parte de su supervisora, sino que le indicó al fiscal Goyco que la licenciada Meléndez no le daba crédito por su tra-bajo y le hacía críticas injustas. Además, se quejó de que la fiscal no quería ayudarla con la reclasificación de su posi-ción a Secretaria Legal II, la cual pagaba mejor.
Luego, el 19 de julio de 1991 la señora Marrero volvió a la oficina del fiscal Goyco y éste le notificó que la licenciada Meléndez estaba de acuerdo con el traslado dado los pro-blemas de trabajo que tenían. De acuerdo con el testimonio de la señora Marrero, fue entonces que le informó al fiscal Goyco del hostigamiento sexual. Alegó que el 2 de agosto de 1991 el fiscal Goyco le pidió que le entregara una solicitud de traslado por escrito, pero sin mencionar en este docu-mento sus verdaderas razones para ello, es decir, el hosti-gamiento sexual.
El 5 de agosto de 1991, aunque fechada 2 de agosto, la señora Marrero le llevó al fiscal Goyco su solicitud por es-crito, la cual no contenía referencia alguna a que la licen-ciada Meléndez la hostigaba sexualmente. Para el 12 de agosto de 1991 la señora Marrero comenzó a laborar en las oficinas de la Fiscalía de San Juan. Aunque tenía la expec-tativa de trabajar directamente para el fiscal Duprey, no había una plaza disponible en esa oficina, por lo que fue asignada a otra área de trabajo que no era de su agrado.
El próximo día, 13 de agosto de 1991, el programa de televisión “La Condesa del Bochinche” difundió que una secretaria del CMID había sido trasladada a las oficinas de la Fiscalía ubicada en el Centro Judicial de San Juan (Cen-tro Judicial) tras ser víctima de hostigamiento sexual por parte de una fiscal de alta jerarquía. Al enterarse de lo *175 propagado, la licenciada Meléndez se alarmó pensando que la noticia se refería a ella dado que no había otra mujer de alta jerarquía en el CMID, por lo que se comunicó con el fiscal Goyco. Sin embargo, éste le informó que la señora Marrero nunca le había hablado de hostigamiento sexual como razón para solicitar el traslado. Al conocer lo anun-ciado por televisión y oír los rumores en los pasillos del Centro Judicial, el señor Purcell, periodista de El Vocero, llamó al fiscal Goyco para confirmar si era cierta la infor-mación difundida. El fiscal Goyco le explicó que sí había trasladado a una secretaria fuera del CMID, pero negó que fuera por razones relacionadas a hostigamiento sexual.
Posteriormente, el 19 de agosto de 1991 la señora Ma-rrero pidió al fiscal Goyco que la reinstalara en su puesto original en el CMID, lo cual le fue negado. Luego, la señora Marrero visitó la Unidad Anti-Discrimen del Departa-mento del Trabajo, pero no formalizó una querella oficial ante esa agencia.
El 15 de octubre de 1991 el fiscal Goyco recibió una carta de la señora Marrero, fechada 1 de octubre de ese mismo año, en la cual manifestó que se había querellado con él en contra de la licenciada Meléndez por hostiga-miento sexual en dos ocasiones anteriores y que nada se había hecho al respecto. También expresó que él le había pedido que solicitara el traslado de su lugar de trabajo sin aludir a las razones verdaderas para ello, en el interés de evitar que se perjudicara a la licenciada Meléndez. En su carta, la señora Marrero no hizo referencia concreta al-guna a un acto o evento de hostigamiento sexual en particular.
En su respuesta de 17 de octubre de 1991, el fiscal Go-yco negó que la señora Marrero le hubiese comunicado ver-balmente sus quejas de hostigamiento sexual y que él le pidiera que no las incluyera en su solicitud de traslado. También le informó a la señora Marrero que le solicitaría al Secretario de Justicia una investigación sobre las impu- *176 taciones de hostigamiento sexual hechas en contra de la licenciada Meléndez, además de una investigación sepa-rada relacionada con la conducta libelosa de la señora Ma-rrero al hacer las recriminaciones difamatorias en contra de él.
El domingo 3 de noviembre de 1991 el señor Purcell entrevistó a la señora Marrero por varias horas en su hogar. Ésta le habló con mucha particularidad sobre todos los incidentes ocurridos entre ella y la licenciada Meléndez sin dejar fuera detalles gráficos del supuesto hostiga-miento sexual.(38) Esa amplia entrevista sirvió de fuente principal para la serie de artículos que comenzaron a pu-blicarse en El Vocero a los dos días siguientes.
El próximo día, 4 de noviembre, la señora Marrero se reportó al Fondo del Seguro del Estado por su condición emocional. Testificó, sin embargo, que ya para entonces es-tuvo recibiendo tratamiento médico privado y tomando me-dicamentos para ayudar a controlar su estado emocional, el cual le impedía realizar sus labores.
En esa misma fecha —aunque recibida por la señora Marrero el 14 de noviembre del mismo año— la Unidad Anti-Discrimen del Departamento del Trabajo envió a la señora Marrero una carta con instrucciones de cómo some-terles una querella escrita, la cual casualmente esta no presentó sino hasta el 3 de enero de 1992.(39)
El Subsecretario de Justicia ordenó que se realizara una investigación interna de la querella para determinar si las alegaciones de hostigamiento sexual de la señora Marrero eran meritorias. La señora Marrero ofreció una declara-ción jurada para dicha pesquisa, junto con la de otros vein-tiún declarantes. Sin embargo, la señora Marrero no com- *177 pareció a la vista informal citada para que la licenciada Meléndez se enfrentara con la prueba, y se negó a firmar su propia declaración jurada aduciendo que no la firmaría sin que primero se le proveyera una copia. La investigación de la querella culminó el 4 de junio de 1992, con la deter-minación final de que las alegaciones de hostigamiento sexual de la señora Marrero eran falsas.(40)
En cuanto a la prueba pericial considerada en el juicio, la defensa de la señora Marrero presentó dos peritos para probar la veracidad de lo alegado por su dienta. La siquia-tra Dra. Cynthia Casanova Pelosi (doctora Casanova) con-cluyó que para la fecha de su examen, el 24 de marzo de 1992, la señora Marrero sufría de un trastorno postraumá-tico y depresión mayor como consecuencia de ser hostigada sexualmente. Sin embargo, admitió en su contrainterroga-torio que no era usual que una víctima de hostigamiento sexual discutiera el asunto sufrido con un periodista y que para la misma época la señora Marrero podría haber es-tado afectada emocionalmente por otras circunstancias, in-cluyendo el hecho de que a su esposo se le estaba investi-gando criminalmente.
La señora Marrero también se sometió a una prueba de polígrafo el 27 de abril de 1996, dirigida por el poligrafista Dr. David Raskin (doctor Raskin). Las cuatro preguntas de la prueba, contestadas por la señora Marrero en la afirma-tiva, fueron las siguientes:
*178 1. ¿Antes de julio de 1991, discutió usted con Santiago Martínez su inquietud de que Iris Meléndez podría haberla hostigado sexualmente?
2. ¿Le sugirió Santiago Martínez a usted que se comu-nicara con César Matos sobre su inquietud de que Melén-dez la había hostigado sexualmente?
3. ¿Discutió usted con Goyco en julio y agosto de 1991 su solicitud de traslado debido a que Meléndez la había hostigado sexualmente?
4. ¿Le dijo Goyco a usted que no mencionara hostiga-miento sexual en su solicitud por escrito para traslado?
El doctor Raskin interpretó los resultados como noventa por ciento indicativo de que la señora Marrero contestó verazmente. Véase Informe pericial del doctor Raskin, Caso Núm. AC-2007-67, Pieza 3, Apéndice de la Apelación, pág. 1212.
En vista de la prueba mayormente testimonial, el Tribunal de Primera Instancia tuvo que sopesar cuál versión de los hechos era más creíble. A la luz de toda la evidencia —resumida por el Tribunal de Primera Instancia en más de sesenta y seis páginas— el foro primario resolvió que la señora Marrero tenía “un plan concertado de hacer todo lo posible por mancillar y desacreditar la reputación de la [fliscal Meléndez”, y que sus imputaciones de hostiga-miento sexual no tuvieron una base que las respaldara. Caso Núm. AC-2007-67, Pieza 2, Apéndice de la Apelación, pág. 000627. Añadió que “las motivaciones alternas y el patrón de conducta desafiante y temerario por parte de la [señora] Marrero [...] no sólo le restan credibilidad, sino que también nos permite ver la intención directa de difa-mar sin importar las consecuencias”. Id., pág. 000628.
Por entender que los apelantes no demostraron prejui-cio o parcialidad de parte del juzgador, el Tribunal de Ape-laciones le otorgó deferencia al Tribunal de Primera Ins-tancia en cuanto a su determinación, fundamentada a base de los testimonios recibidos, de que la señora Marrero min- *179 tió acerca de las imputaciones de hostigamiento sexual. En cuanto a la prueba pericial, conforme la regla general esbozada en López v. Dr. Cañizares, 163 DPR 119, 135-136 (2004), el Tribunal de Apelaciones la evaluó por sí mismo y concluyó que “adolecfía] de deficiencias que le restaban] peso en contraposición con el resto de la prueba del caso”. Caso Núm. AC-2007-66, Pieza 4, Apéndice de la Apelación civil, pág. 1642. Por lo tanto, afirmó que la señora Marrero publicó sus imputaciones de hostigamiento sexual a sa-biendas de que eran falsas.
Según nuestro análisis del expediente, concordamos con el resultado del Tribunal de Primera Instancia y el Tribunal de Apelaciones: la licenciada Meléndez probó clara y convincentemente que la señora Marrero tuvo conoci-miento de la falsedad de sus imputaciones difamatorias y las publicó a sabiendas de dicha falsedad. Si bien es cierto que el trasfondo procesal del juicio en el caso de autos no es común, no cabe duda que el juez Roque Colón ciertamente pudo apreciar la credibilidad de los testigos que proveye-ron sus extensos testimonios ante él. Tampoco hay reparo en cuanto al hecho de que la señora Marrero declaró ante el juez Roque Colón durante dos días. Igualmente, el fiscal Gloyco y la fiscal Lora testificaron nuevamente durante la segunda fase del juicio. Como dijimos, esto le dio la opor-tunidad al magistrado de aquilatar la credibilidad de estos testimonios. El juez Roque Colón estuvo en una mejor po-sición para sopesar la prueba oral que un tribunal apela-tivo obrando con solo una transcripción silenciosa. Esta-mos de acuerdo con la observación del Tribunal de Apelaciones de que “toda vez que la prueba de un caso debe evaluarse en conjunto, resulta evidente que un juez que, si bien no presidió el juicio durante los noventa y un (91) días que duró el mismo, sí recibió prueba durante treinta y siete (37) de éstos [,] está en mejor posición que este Tribunal para formular las correspondientes determinaciones de *180 hechos”. Caso Núm. AC-2007-66, Pieza 4, Apéndice de la Apelación civil, págs. 1634-1635.
A la luz de nuestra discusión sobre el estándar de revi-sión apelativa adecuada en casos de difamación de una fi-gura pública, aun desempeñando un examen indepen-diente de la prueba, las determinaciones de credibilidad no se descartarán a menos que sean claramente erróneas. Harte-Hanks Communications v. Connaughton, supra, pág. 688. Nada nos lleva a opinar que se cometió tal error en el juicio ante nuestra consideración. Por lo tanto, brin-damos deferencia a la determinación de instancia relativa a que la señora Marrero mintió al formular sus imputacio-nes de hostigamiento sexual contra la licenciada Meléndez.
Asimismo, la abrumadora cantidad de prueba oral que desmiente a la señora Marrero y expone su hostilidad ha-cia la licenciada Meléndez supera las contribuciones que la prueba pericial hace en favor de la señora Marrero. Es re-gla bien conocida en nuestra jurisdicción que la presencia de prueba pericial no obliga a este o a cualquier tribunal a decidir un caso conforme lo sugerido por los peritos. Culebra Enterprises Corp. v. ELA, 143 DPR 935, 952 (1997); Díaz García v. Aponte Aponte, 125 DPR 1, 13 (1989).
Según nuestro parecer, el peso del informe pericial de la doctora Casanova fue mitigado dado que esta llegó a su conclusión tomando como ciertas las alegaciones de la se-ñora Marrero sin haber hablado con la licenciada Melén-dez y sin haber revisado las transcripciones de las deposi-ciones de las otras partes, tal como había solicitado. En cambio, el juzgador de los hechos sí pudo formar su opinión sobre la falta de credibilidad de la señora Marrero con in-formación suplida por todas las partes y no solo a base de un punto de vista parcial. La doctora Casanova tampoco descartó la posibilidad de que los rasgos depresivos que le diagnosticó a la señora Marrero fueran causados por otros factores personales y no por los supuestos incidentes de hostigamiento que describió.
*181 Por otro lado, las preguntas del doctor Raskin no inqui-rieron directamente sobre los alegados hechos de hostiga-miento sexual. Más bien, las preguntas suministradas apuntaron hacia si la señora Marrero le informó o no al fiscal Santiago Martínez o al fiscal Goyco, o a ambos, que se sentía hostigada sexualmente por su supervisora. (“The purpose of the examination was to assess her credibility with regard to her allegations that she reported that she had been sexually harassed by her supervisor District Attorney IRIS D. MELENDEZ VEGA” (énfasis nuestro)). Caso Núm. AC-2007-66, Pieza 4, Apéndice de la Apelación civil, pág. 1211. Sin embargo, según notamos anteriormente, el enfoque del presente caso se centra en si se difamó a la licenciada Meléndez cuando se le acusó de cometer actos de hostigamiento sexual dirigidos a su exsecretaria; no en los alegados actos de encubrimiento de la querella. Además, tal como estableció el Tribunal Supremo federal en United States v. Scheffer, 523 US 303, 309 (1998), nos consta que pruebas de esta índole, es decir, poligráficas, son poco confiables.
Resulta también curioso que la señora Marrero hubiese declarado en la investigación del Departamento de Justicia que más de treinta personas tenían conocimiento personal del hostigamiento, pero en el juicio instado en su contra no pudo presentar testigo alguno que corroborara el alegado comportamiento ilícito de la licenciada Meléndez. La única excepción fue la Sra. Elba Mejías Muñiz (señora Mejías), taquígrafa que trabajaba en el CMID y amiga de la señora Marrero, quien testificó que una vez oyó cuando la licen-ciada Meléndez le dijo a la señora Marrero que no se debía poner su chaqueta porque se veía “sexy” sin ella. Sin embargo, los abogados de la licenciada Meléndez impugnaron a esta testigo exitosamente al confrontarla con las declara-ciones que realizó en su deposición, donde confesó que su *182 conocimiento de los hechos estaba basado enteramente en lo que la señora Marrero le relataba.(41)
Tampoco podemos obviar la prueba presentada relativa a la animosidad que la señora Marrero albergaba contra la licenciada Meléndez.(42) Sin lugar a dudas, la señora Ma-rrero fue excelente trabajadora bajo la dirección de los an-teriores jefes del CMID, pero su disposición hacia la licen-ciada Meléndez resultó ser todo lo contrario. El hecho de que se disminuyeran sus responsabilidades y que la fiscal no la recomendara para el ascenso laboral evidencian un posible motivo para difamarla intencionalmente.
Por consiguiente, tomando en cuenta que el Tribunal de Primera Instancia no creyó a la señora Marrero, pero sí a la licenciada Meléndez; la tensión que marcaba la relación profesional entre ellas, y la existente entre la señora Ma-rrero y el resto del personal del CMID, y en vista de todas las circunstancias que rodean las expresiones falsas en el caso de autos, confirmamos que se probó malicia real por parte de la señora Marrero clara y convincentemente. De-bido a que las alegaciones falsas se referían a la licenciada Meléndez de manera específica, ocasionándole daños a su *183 reputación, según explicamos más adelante, resolvemos que la causa de acción por difamación en su contra se concretó.
Cabe señalar también que, contrario a lo que alega la señora Marrero como planteamiento de error, no se le im-puso responsabilidad por las publicaciones y la informa-ción diseminada por El Vocero, de las cuales obviamente no tuvo control, participación o poder decisional. Más bien, la señora Marrero responde ante la licenciada Meléndez úni-camente por lo que ella misma comunicó a las diferentes personas con quien discutió los hechos falsos. No cabe duda de que, a base de la evidencia creíble en el expediente, la señora Marrero difamó a la licenciada Meléndez.
B. Las publicaciones de la prensa
La prensa, por su parte, critica la poca profundidad en que se adentraron el Tribunal de Primera Instancia y el Tribunal de Apelaciones en los extensos hechos presenta-dos durante el transcurso del largo juicio. Señala que esto denota la falta de prueba demostrativa de malicia real. También argumenta que ambos foros recurridos incum-plieron con su deber revisor al analizar la serie de artículos de manera generalizada y englobada en lugar de aquilatar cada uno de los cuarenta y tres artículos para determinar si cumplían con los elementos jurídicos necesarios para ser difamatorios. Además, reclama estar cobijada bajo el privi-legio del informe justo y verdadero. Veamos.
Conforme indicamos anteriormente, en calidad de foro revisor nos toca realizar una evaluación independiente de la prueba presentada ante el Tribunal de Primera Instancia para determinar si el señor Purcell y El Vocero efectiva-mente obraron con malicia real en su vertiente de obrar con un grave menosprecio de si lo publicado era falso o no, al diseminar las imputaciones de la señora Marrero de ser víc-tima de hostigamiento sexual por la licenciada Meléndez.
*184 En St. Amant v. Thompson, 390 US 727 (1968), el Tribunal Supremo federal estableció algunas guías amplias para determinar lo que constituye actuar con grave menos-precio, tal y como se requiere en el ámbito de la difama-ción:
[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. íd., pág. 731. Véanse: Harte-Hanks Communications v. Connaughton, supra, págs. 666 y 688; Rosenblatt v. Baer, supra, pág. 84.
Jurisprudencialmente incorporamos ese concepto a nuestro ordenamiento legal de la manera siguiente:
No puede establecerse el “grave menosprecio” a que alude la norma, a menos que la prueba sostenga una determinación de que el demandado albergaba “un alto grado de conciencia de [...] la probable falsedad” [...] Es imprescindible que el deman-dado “en efecto abrigue serias dudas sobre la certeza de la publicación” [...] Se ha resuelto que aun prueba de mala volun-tad u odio no satisface de por sí el grado constitucionalmente requerido de la prueba de malicia [...] Se ha resuelto también que el “grave menosprecio” a que alude la norma “no se mide por lo que un hombre razonablemente prudente hubiese publicado o hubiese investigado antes de la publicación”. Tiene que existir prueba suficiente que permita concluir que el demandado abrigaba serias dudas sobre la certeza de la información” [...] García Cruz v. El Mundo, Inc., supra, págs. 180—181. Véase Garib Bazain v. Clavell, supra, pág. 484.
Ahora bien, esto no significa que un demandado puede asegurarse un resultado favorable en un pleito de difama-ción con simplemente testificar que creyó en la veracidad y certeza de lo publicado. Es deber del juzgador de los hechos determinar la buena fe del demandado cuando publica. St. Amant v. Thompson, supra, pág. 732. Véase 3 Smolla Nimmer on Freedom of Speech Sec. 23:3, págs. 23-26 a 23-27 (2013) (“It is a fundamental axiom of defamation *185 law that actual malice is often proven by circumstantial evidence and that mere protestations of good faith by a defendant do not preclude establishing actual malice through other inferential or circumstantial proof”).
En aras de asistir a los tribunales de instancia en el proceso de sopesar la prueba relevante a la cuestión de grave menosprecio, el Tribunal Supremo de Estados Unidos ha señalado varios ejemplos donde la evidencia circunstancial podría resultar suficientemente poderosa para refutar la alegada buena fe del declarante. Estos son: cuando hay evidencia de que la información fue fabricada por la persona que lo publicó o se basó enteramente en una fuente anónima; cuando las alegaciones son tan inherentemente improbables que solo una persona temeraria las pudo haber publicado, o cuando existen razones obvias para dudar de la veracidad del informante o de la precisión de la información suplida.(43) St. Amant v. Thompson, supra, pág. 732. Véase García Cruz v. El Mundo, Inc., supra, pág. 181 (“[L]a información puede ser tan inherentemente improbable que tan solo una persona temeraria pueda decidir difundirla. Pueden existir también razones obvias para dudar de la veracidad de la fuente” (citas omitidas)). Véase, además, Krans Bell v. Santarrosa, 172 DPR 731, 732-757 (2007), opinión disidente del Juez Asociado Señor Rivera Pérez.
Por otro lado, es una regla bien establecida por el Tribunal Supremo federal que la falta de investigación antes de publicar, sin más, no es suficiente para establecer *186 malicia real, aunque una persona prudente lo hubiera hecho. Harte-Hanks Communications v. Connaughton, supra, pág. 688; St. Amant v. Thompson, supra, pág. 733. Véase Elder, op. cit, pág. 7-141.
Sin embargo, sí podría demostrar malicia real en algu-nas circunstancias la prueba de que quien publicó la infor-mación evitó intencionalmente auscultar información de otras fuentes que contradicen la versión publicada. Harte-Hanks Communications v. Connaughton, supra, pág. 692. Véase Elder, op. cit., pág. 7-117 (“[A] publication may suffice to show knowing or reckless disregard of falsity where the nature of the known contradictory or refutatory evidence is such as to suggest that defendant’s information was quite probably in error”). Véase, además, Cabrero v. Zayas, 167 DPR 766, 777 (2006) (Sentencia), opinión de conformidad de la Juez Asociada Señora Rodríguez Rodríguez.
En Harte-Hanks Communications v. Connaughton, supra, el Tribunal Supremo de Estados Unidos ilustró cómo un conjunto de prueba circunstancial puede dar lugar a una inferencia de malicia real. En ese caso, el periódico demandado recibió información de una tal Alice Thompson, quien alegaba que Daniel Connaughton, candidato para juez municipal, le había ofrecido recompensas a ella y a su hermana por cooperar en una investigación sobre la con-ducta ilícita de un empleado de su rival electoral. Después de recibir dicha información, los reporteros del periódico entrevistaron al señor Connaughton y a todos los demás testigos de la conversación entre éste y la informante, ex-cepto a la hermana de la señora Thompson. Todos negaron rotundamente lo imputado por la señora Thompson. No obstante, el rotativo decidió publicar lo que ésta alegó.
El Tribunal Supremo federal resolvió que los siguientes factores, junto con la determinación unánime de credibili-dad que dio el Jurado a la versión de los hechos ofrecida *187 por el señor Connaughton, indicaban malicia real. Encon-tró sospechoso que se entrevistaran a todos los testigos del evento menos a la hermana de la señora Thompson, quien representaba la única persona sin interés en proteger la imagen del señor Connaughton y quien hubiera podido confirmar las imputaciones. Los seis testigos, excluyendo la señora Thompson y su hermana, corroboraron la versión pautada por el señor Connaughton, quien negó que se ofre-cieran recompensas de clase alguna. El periódico tampoco escuchó las grabaciones de la conversación entre la señora Thompson y el señor Connaughton para verificar si lo im-putado era o no era cierto. Por último, el Foro máximo dedujo que el editorial que se publicó el día antes de recibir las alegaciones para desmentir lo relatado por la señora Thompson —el cual aludía a futuras noticias concernientes a la integridad de los candidatos— demostró sin lugar a dudas que el demandado decidió publicar las imputaciones difamatorias sin importar la falta de corroboración. Harte-Hanks Communications v. Connaughton, supra, págs. 681-685. El Tribunal Supremo determinó que, ante la to-talidad de la prueba, se tomaron decisiones deliberadas para no adquirir conocimiento que llevara a confirmar la probable falsedad de lo informado. íd., pág. 692.
En cuanto al caso de autos, el Tribunal de Primera Ins-tancia concluyó que la prensa no mostró un mínimo de in-terés en cotejar la veracidad de la información que publicó concerniente a la licenciada Meléndez, a la vez que encon-tró que la “confiabilidad de las fuentes principales, la [señora] Marrero y el [licenciado] Santiago Rivera, era su-mamente cuestionable”. Caso Núm. AC-2007-66, Pieza 2, Apéndice de la Apelación civil, pág. 000624. En cuanto al señor Roca —el entonces Presidente de El Vocero — , encon-tró que este tuvo participación activa en las publicaciones y permitió que se publicaran las falsedades al no exigir corroboración. En apelación, el tribunal apelativo interme-dio confirmó que la licenciada Meléndez probó “clara y *188 convincente [mente] que el [señor] Purcell rehusó intencio-nalmente obtener información que contradecía las alega-ciones de la [señora] Marrero”. Caso Núm. AC-2007-66, Pieza 4, Apéndice de la Apelación civil, pág. 1654.
La prensa difiere de dichas determinaciones. Plantea que ambos tribunales obviaron cierta prueba indicativa de la veracidad de las alegaciones de la señora Marrero y que el señor Purcell no estaba obligado a entrevistar a la licen-ciada Meléndez o a dudar de las alegaciones aportadas por su informante, la propia víctima del hostigamiento sexual, frente a las negaciones de terceros sobre los supuestos ac-tos impropios de la licenciada Meléndez.
Nuestro examen de la prueba presentada durante el largo juicio, la cual guarda semejanzas notables al cuadro fáctico de Harte-Hanks Communications v. Connaughton, supra, nos convence que las circunstancias atinentes a la decisión de la prensa de publicar los artículos difamatorios fue una revestida de malicia real. Veamos.
En su deposición, el señor Purcell indicó que la primera vez que supo del traslado de una secretaria del CMID —que luego se enteró que era la señora Marrero— debido al supuesto hostigamiento sexual fue el 13 de agosto de 1991, por conversaciones con diversos funcionarios en el Centro Judicial, quienes comentaban sobre lo anunciado ese día en “La Condesa del Bochinche”. Dijo que varios fiscales,(44) alguaciles y secretarias le habían informado que la señora Marrero les indicó que se había quejado con el fiscal Goyco por el hostigamiento sexual. No obstante, el señor Purcell tuvo que admitir que estos informantes nunca le confirmaron que la vieron acudir al fiscal Goyco. También testificó que desde que oyó los rumores por los pasillos del Centro Judicial que implicaban a la licenciada Meléndez con lo informado en el programa de televisión, lo *189 dio por cierto.(45) Nos llama la atención que el señor Purcell llegó a esta conclusión operando puramente a base de ru-mores y sin haber hablado con la señora Marrero o con la licenciada Meléndez.
Posteriormente, el señor Purcell llamó al fiscal Goyco para verificar si lo comentado era cierto. Este último negó que el traslado de la secretaria hubiese sido motivado por hostigamiento sexual. Sin embargo, el señor Purcell testi-ficó que no le creía al fiscal Goyco dado el historial entre ellos y por toda la otra información que ya había recibido de terceros.
A mediados del mes de agosto de 1991, armado con esa pesquisa limitada, redactó y sometió a El Vocero un artí-culo exponiendo como ciertos los rumores de que la direc-tora del CMID había hostigado sexualmente a su secretaria. El señor Purcell testificó que en ese momento se sentía bastante seguro de que estaba publicando informa-ción veraz y que nunca consideró la posibilidad de que la existencia de una querella fuese falsa.(46)
En ese mismo mes de agosto, el señor Purcell también tuvo una conversación con la fiscal Lora sobre el supuesto hostigamiento sexual. Ella le indicó que no podía ser cierto que la licenciada Meléndez hubiese hostigado a su exsecre-taria y que él debía entrevistarla si interesaba conocer lo que realmente sucedió. Sin embargo, el señor Purcell de- *190 clinó la invitación de hablar con la licenciada Meléndez.(47) La actitud del señor Purcell en ese momento y el hecho de que escribió un borrador sin corroboración sustantiva al-guna del hostigamiento sexual demuestran que no estaba dispuesto a recibir información que lo llevara a cuestionar la veracidad de lo que hasta ese momento eran rumores.
Transcurridos varios días y al percatarse de que no se había publicado su borrador, el señor Purcell llamó a las oficinas de El Vocero para indagar al respecto. Testificó en su deposición que, siendo un periodista de una larga ca-rrera, naturalmente quería que todo lo que él escribiera se publicara y entendía que el artículo estaba listo para imprimirse. Eventualmente, el señor Roca le informó que el borrador se había referido a la División Legal porque se trataba de un asunto delicado. Los abogados del periódico le informaron al señor Purcell que no aprobaron la publi-cación del artículo dado que el fiscal Goyco negaba que hubiese una querella de hostigamiento sexual, pero le ad-virtieron que, “si investigas y consigues corroboración, ha-blamos entonces”. A base de ello, el señor Purcell se “dedi[có] de lleno, a partir de agosto, hasta noviembre” a conseguir la corroboración necesaria.
En el curso de su búsqueda, el señor Purcell volvió a entrevistar al fiscal Goyco el 17 de octubre de 1991, justo después de que éste recibió la carta de la señora Marrero, donde ésta solicitó una investigación sobre la conducta im-propia de la licenciada Meléndez. En esa reunión, el fiscal Goyco le mostró al señor Purcell la respuesta que le estaba *191 cursando a la señora Marrero, donde negaba que tuviera conocimiento previo de las alegaciones contra la licenciada Meléndez.
Posteriormente, el 3 de noviembre de 1991, el señor Purcell finalmente logró entrevistar por varias horas a la señora Marrero. La encontró, en su opinión, coherente y creíble. A los dos días, El Vocero publicó el primer artículo de la serie divulgando las alegaciones difamatorias de la señora Marrero contra su exsupervisora.
Por otro lado, es curioso que el señor Roca, quien era el único supervisor del señor Purcell y quien decidía qué se publicaba en el periódico, nunca le pidió a éste que le pro-veyese una corroboración de lo alegado en sus escritos. Esto, cuando apenas cuatro meses antes no había permi-tido la publicación del primer borrador del señor Purcell, porque su contenido era “delicado” al tratarse de hostiga-miento sexual. Después de todo, como señaló el Sr. Cruz Roqué Vicens (señor Roqué), jefe de redacción de El Vocero, de ser falso lo difundido podría causar daños permanentes a la licenciada Meléndez, dada la naturaleza de la noticia. Sin embargo, surge del testimonio que la revisión editorial de lo redactado por el señor Purcell el 4 de noviembre de 1991 se hizo ese mismo día sin que mediara otro docu-mento o prueba que no fuese dicho escrito.
Surge claramente de sus mínimos esfuerzos investi-gativos(48)que el señor Purcell solo estaba interesado en co-rroborar lo que él ya daba por cierto. Es decir, que la señora Marrero se trasladó del CMID por ser víctima de hos-tigamiento sexual de su supervisora, la licenciada Meléndez. Resulta curioso que casi inmediatamente después de hablar con la señora Marrero —a solo dos días— se *192 publicó el primer artículo de lo que se convirtió en una larga serie. Aparentemente, la investigación del señor Purcell cesó del todo en cuanto habló con la alegada víctima.(49) Así pues, la prensa estaba satisfecha con publicar la ver-sión de su fuente principal, la señora Marrero, y no creyó necesario cotejarla con otras fuentes que pudieran tener conocimiento directo de los eventos. El único seguimiento que dio el señor Purcell con respecto a la noticia consistió de sus conversaciones con el licenciado Santiago Rivera mientras se desarrollaba la investigación interna de la querella dentro del Departamento de Justicia y se iniciaba el pleito instado por la señora Marrero en el tribunal federal.(50) Nos parece que la decisión de la prensa de pu-blicar se tomó en ausencia de apreciación alguna de las circunstancias que rodeaban sus únicas fuentes.
El expediente nos convence de que había indicaciones suficientes para dudar de la veracidad de su informante principal. Por ejemplo, la señora Marrero aconsejó al señor Purcell que no debía molestarse en hablar con su compa-ñera de trabajo, la señora Alicea, porque ésta negaría ha-ber presenciado los actos de hostigamiento por miedo a re-presalias en su trabajo. La señora Alicea se llevaba bien con la señora Marrero y la pudo haber desmentido —lo cual eventualmente hizo— sin el pretexto de que quería favorecer a la licenciada Meléndez. Esta instrucción de la señora Marrero y la omisión de la prensa de hablar con la señora Alicea es una conducta similar a la de la informante y del periódico en Harte-Hanks Communications v. Con- *193 naughton, supra, factor que mereció la incredulidad del máximo Foro federal. Esto debió levantar sospechas y lle-var al señor Purcell a cotejar la veracidad y credibilidad de la información suplida por su informante antes de aceptar ciegamente su versión de los hechos. Sin embargo, en lugar de comparar notas con otras fuentes que pudieran haber clarificado lo que realmente provocó el traslado de la señora Marrero, incluso entrevistar aquellas personas señaladas por la propia señora Marrero quienes alegadamente tenían conocimiento personal del hostigamiento sexual —tal como se hizo en Harte-Hanks Communications v. Connaughton, supra— el señor Purcell recopiló en sus reportajes todo lo informado por la señora Marrero y su re-presentante legal, el licenciado Santiago Rivera.(51) Aunque éstos ciertamente tenían un interés personal en confirmar lo imputado, el señor Purcell rehusó considerar la posibilidad de que le estuviesen mintiendo.(52)
Otra indicación de la falta de credibilidad de la señora Marrero surge de las múltiples negaciones que recibió el señor Purcell antes de comenzar y durante la publicación de la serie.(53) Inicialmente, el fiscal Goyco y la fiscal Lora *194 negaron el traslado por hostigamiento. Luego, a raíz de la primera publicación de 5 de noviembre de 1991, muchas personas “desde los de mantenimiento hasta jueces del apelativo” le expresaron dudas sobre lo relatado. Incluso, se organizó una conferencia de prensa en apoyo de la licen-ciada Meléndez el mismo 5 de noviembre de 1991, la cual el señor Purcell rápidamente abandonó cuando la señora Alicea le negó lo que la señora Marrero le había informado. A pesar de no haberle hecho caso a las negativas y dudas antes de publicar el primer artículo, por lo menos debió tomarlas en cuenta para los siguientes reportajes redactados. Sin embargo, el señor Purcell testificó que no le llamó la atención ni le dio importancia,(54) y continuó publicando la serie de artículos.
*195 Aparenta ser que el señor Purcell se dedicaba a hacer lo necesario para que se publicara lo que relató en el borrador que escribió en agosto de 1991, incluyendo intencional-mente el evitar toparse con información que lo llevaría a cuestionarse la veracidad de lo alegado. Véase Harte-Hanks Communications v. Connaughton, supra, pág. 684; Smolla Nimmer on Freedom of Speech, supra, págs. 23-29 a 23-30 (“[E]vidence of a preconceived story line may be probative of actual malice [...]”).
Contrario a Harte-Hanks Communications v. Connaughton, supra, donde se confrontó a la persona objeto de las imputaciones falsas, en el caso de autos ni siquiera se le dio una oportunidad a la licenciada Meléndez de ofrecer su versión de los hechos a la prensa. Esto tiende a indicar que no solo hubo una falta de investigación adecuada, sino que la prensa quería evitar enterarse de información que la pondría en una posición comprometedora.
Por todo lo anterior, concluimos que la licenciada Melén-dez probó clara y convincentemente que la prensa actuó con un grave menosprecio de si la información publicada en cuanto a su persona era o no falsa. Ello no solo en cuanto al primer artículo, sino a través del tiempo que se prolongó la serie aquí reclamada.
VII

Análisis de las publicaciones

La prensa argumenta que los tribunales recurridos interpretaron nuestra directriz en Meléndez v. El Vocero de Puerto Rico, 144 DPR 389 (1997), erradamente y que no revisaron individualmente cada artículo de la serie objeto del litigio. En esa ocasión reconocimos que la demanda en controversia presentó una sola causa de acción por la serie de artículos difamatorios publicados por la prensa. Id., págs. 392-393. Explicamos entonces que la licenciada Meléndez reclamó
*196 [...] por una única causa de acción, al pedir indemnización, no por los daños de cada publicación aisladamente, sino por los efectos acumulativos de todas las publicaciones tomadas en conjunto. Esta causa de acción es evidentemente diferente a la de reclamar daños por cada artículo publicado, en cuyo caso cada uno de ellos constituiría una causa de acción separada. Meléndez v. El Vocero de Puerto Rico, supra, pág. 397.
Reconocimos, por lo tanto, que existen dos alternativas para caracterizar la causa de acción; se pueden reclamar daños por cada artículo publicado por separado o se puede demandar a base del efecto global de una serie de artículos.
Irrespectivamente del tipo de reclamación, un deman-dante siempre estará obligado a probar en cada caso todos los requisitos correspondientes a la causa de acción por difamación. Es decir, tendrá que establecer que las expre-siones objeto del pleito son falsas; que se refieren específi-camente a su persona; que se hicieron con malicia real —en el caso de figuras públicas — , y que le causaron daños.
Es importante destacar que la mera mención de la exis-tencia de una querella por hostigamiento sexual contra la licenciada Meléndez no constituye difamación, como tam-poco lo son las publicaciones que solo reportan sobre el estatus del trámite de la correspondiente investigación dentro del Departamento de Justicia. El hecho de que se haya presentado una querella contra la licenciada Melén-dez, que la querella se haya investigado administrativa-mente y que luego sirviera de base para varios pleitos en el foro federal y estatal, resulta verdadero e irrefutable. Por lo tanto, si los reportajes se limitaran a proveer esa infor-mación, hubiesen quedado protegidos.
Sin embargo, en este caso nos enfrentamos a una serie de artículos difamatorios que fueron publicados con grave menosprecio de si lo aseverado era verdadero o no y se referían específicamente a la licenciada Meléndez, causándole daños a su reputación. Véase St. Amant v. Thompson, supra; Harte-Hanks Communications v. Connaughton, supra. Veamos.
*197 En la primera publicación de la serie de El Vocero, co-rrespondiente al 5 de noviembre de 1991, el titular en la portada leía, en parte, “Hostigaba secretaria en la oficina”. A continuación, el artículo presentó una larga descripción de las acusaciones falsas y difamatorias de la señora Ma-rrero contra la licenciada Meléndez.(55)
El próximo día, 6 de noviembre de 1991, el periódico aludió a “la terrible situación que [la señora Marrero] vivía por el hostigamiento sexual constante de parte de la fiscal Meléndez”. Caso Núm. CC-2007-827, Pieza 1, Apéndice de la Petición de certiorari, pág. 88.
*198 Seguidamente, el artículo publicado el 7 de noviembre de 1991 nuevamente recalcó algunos de “los serios inciden-tes con la Fiscal, incluso las ‘caricias al cabello, los sobos a la nuca y las flores que le echaba constantemente a las piernas y a su cuerpo’ ”, además del “comentario que hizo la fiscal Meléndez sobre el regalo del juego de ropa [fintima [...] que ‘este regalo es para ponérmelo en una ocasión especial, aunque tenga que esperar’ Caso Núm. CC-2007-827, Pieza 1, Apéndice de la Petición de certiorari, pág. 89. Incluyó, también, el hecho de que la señora Alicea, su-puesta testigo de varios de los incidentes de hostigamiento, negaba haber presenciado los alegados eventos “por estar atemorizada por la fiscal Meléndez, debido a que si dice la verdad sería objeto de represalias o despido”. Id.
La semana siguiente, el 13 de noviembre de 1991, El Vocero volvió a recoger todos los detalles del alegado hostigamiento antes publicados y añadió comentarios adicionales.(56) Luego, el artículo de 15 de noviembre de 1991 describió la supuesta reacción tempestuosa de la li-cenciada Meléndez cuando las señoras Marrero y Alicea regresaron tarde después de almorzar con el fiscal Díaz.(57)
Dentro del mismo mes, para el 27 de noviembre de 1991, El Vocero falsamente publicó, además, que la licen- *199 ciada Meléndez “puso a disposición del [Sjecretario de Jus-ticia, Ledo. Jorge Pérez Díaz, su puesto de Fiscal Jefe del Centro, como resultado de la controversia existente con la radicación de una querella por hostigamiento sexual de parte de su ex secretaria Martha Marrero de Ramos”,(58) pero que la renuncia fue rechazada por el Secretario debido a consideraciones legales, dado que la licenciada Meléndez estaba bajo investigación administrativa.
Pasados unos meses, el 11 de febrero de 1992 El Vocero diseminó que, según la señora Marrero, “la fiscal Meléndez Vega comenzó una campaña de comentarios negativos contra Martha, que hacían patente una supuesta intención de destruirla, por sus negativas ante los ilegales avances sexuales”. Caso Núm. CC-2007-827, Pieza 1, Apéndice de la Petición de certiorari, pág. 109.
El reportaje de 25 de enero de 1993 incluyó alegaciones infundadas de la señora Marrero de que la Directora del CMID “ha[bía] seguido incurriendo en conducta similar, parecida o relacionada con diferentes personas, algunas de estas supervisadas por la fiscal Meléndez y otras civiles que han generado querellas contra ella en el Departa-mento de Justicia”. Caso Núm. CC-2007-827, Pieza 1, Apéndice de la Petición de certiorari, pág. 127.
Los artículos de la serie no solo entraron en los detalles de lo que la señora Marrero sostuvo falsamente referente a los supuestos actos de hostigamiento sexual de la licen-ciada Meléndez, sino que intentaban reforzar las declara-ciones de la secretaria a través de expresiones que exalta-ban lo detallada que había sido la declaración de la secretaria y el daño psicológico que había sufrido; desacre-ditaban a quienes desmentían la historia; manifestaban que presionaban a empleados del Departamento de Justi-cia para apoyar a la fiscal Meléndez; aseguraban que ha-bían interferencias indebidas con la investigación adminis- *200 trativa, que todo estaba orquestado para encubrir el hostigamiento y que el resultado de la investigación era de esperarse porque siempre se favoreció a la fiscal Meléndez; indicaban que habían muchos testigos que hablarían sobre el hostigamiento y que quienes daban versiones diferentes a las de la señora Marrero lo hacían por temor a represa-lias; señalaban que a la secretaria se le hacía difícil conse-guir abogado porque todos temían una venganza de parte del Departamento de Justicia por ir contra la fiscal Melén-dez y que no le querían entregar documentos que necesi-taba para presentar su caso; excusaban las desestimacio-nes de las demandas de la secretaria contra la fiscal Meléndez; criticaban la forma en que la fiscal Meléndez se estaba relacionando con su personal luego de la querella; informaban que no era la primera vez que una empleada se querellaba contra ella; afirmaban que en el Departamento de Justicia acosaban a la secretaria y a su esposo, y expre-saban que los fiscales estaban jugando con el proceso in-vestigativo y las posibilidades de transigir los pleitos.
Dado el tipo de causa de acción de este caso, no se pueden atender los artículos de manera aislada. La serie de artículos relacionados con la querella por hostigamiento sexual debe verse como un conjunto. Asimismo, aunque no todos los artículos de la serie relatan los hechos de hostigamiento que se determinó que eran falsos, todos hacen referencia a la querella de hostigamiento sexual e incluyen el nombre completo, el puesto y, en ocasiones, la foto de la fiscal Meléndez. La mayoría de los artículos de la serie están identificados en el titular con frases como “caso hostigamiento contra la fiscal”, “querella hostigamiento fiscal” y “fiscal acusada por hostigamiento sexual”. Esa identificación refiere a las historias que describen el hostigamiento publicadas anteriormente por el periódico, las cuales nunca fueron desmentidas en el diario. Un lector común asocia las historias de seguimiento sobre el encubrimiento, las irregularidades en la investigación y las de- *201 mandas con las primeras noticias sobre los avances sexua-les de la fiscal Meléndez contra su secretaria y sus abusos de poder. Como mencionamos anteriormente, el requisito de referencia específica se mide de acuerdo con lo que los receptores de la noticia razonablemente entendieron, irres-pectivamente de si la asociación que la audiencia hace con el demandante fue intencional o no. Colón, Ramírez v. Televicentro de P.R., supra, pág. 722 esc. 28.
Por otro lado, es menester considerar el rol del privilegio estatutario del informe justo y verdadero que protege a la prensa. Además de la inmunidad que confiere la See. 4 de la Ley de Libelo y Calumnia, supra, atinente a las comunicaciones hechas en un procedimiento legislativo, judicial u otro autorizado por la ley, según discutida ante-riormente, el mismo cuerpo legal establece que “[n]o se presumirá que es maliciosa la publicación que se hace [...] [e]n un informe justo y verdadero de un procedimiento judicial, legislativo u oficial, u otro procedimiento cualquiera, o de algo dicho en el curso de dichos procedimientos”. 32 LPRA sec. 3144.
A diferencia de la plena protección ofrecida a las expre-siones hechas durante y como parte de un procedimiento legal, el privilegio condicional del reporte o informe justo y verdadero aplica a las recopilaciones de lo allí ocurrido que se hacen para el beneficio de la ciudadanía a través de los medios. Este privilegio se asienta en la idea de que el reportero actúa como sustituto del público en la observación de un evento. Villanueva v. Hernández Class, supra, pág. 648; Caraballo v. P.R. Ilustrado, Inc., 70 DPR 283, 288-289 (1949).
Del texto estatutario resaltan dos requisitos ne-cesarios para configurar el privilegio del informe justo y verdadero. Primero, el reporte tiene que ser justo en cuanto al objeto de información, es decir, que debe captar lo acontecido tomando en consideración el probable efecto que su presentación tendrá en la mente de un lector y *202 oyente promedio. Segundo, lo publicado tiene que ser cierto y reflejar, de manera sustancial, lo verdaderamente expresado o acontecido en el procedimiento llevado a cabo. Villanueva v. Hernández Class, supra, págs. 647-648. Este privilegio abriga, incluso, la difusión de una expresión falsa o difamatoria si ésta es relatada justa y verdaderamente. Id., pág. 648.
Si bien es cierto que este privilegio ha sido reconocido como uno de los más importantes para la protección de la prensa contra ataques de libelo —Villanueva v. Hernández Class, supra, pág. 648— no es menos cierto su aplicabilidad restringida. Acevedo v. Western Digital Caribe, Inc., 140 DPR 452, 462 (1996); Caraballo v. P.R. Ilustrado, Inc., supra, págs. 288 y 290. Si se redacta un relato parcializado y subjetivo de lo acontecido, y se prueba que el demandado divulgó la información maliciosamente con un ánimo pre-venido para causar daño o conociendo la falsedad de la información, el privilegio no existe.(59) Villanueva v. Hernández Class, supra, págs. 648-649. Véase Elder, op. cit., pág. 3-56; Smolla, op. cit., Secs. 8:61-8:65 y 8:75.
Como la prensa actuó con malicia real al publicar esta serie de noticias difamatorias, no cualifica para la protec-ción ofrecida bajo el privilegio de un informe justo y verdadero.
Luego de una minuciosa lectura de la serie de publica-ciones en el caso de autos a la luz de las consideraciones antes expuestas, encontramos que es difamatoria. La serie de artículos ciertamente dio una extensa cobertura a la investigación de la licenciada Meléndez por hostigamiento sexual y otros asuntos tangenciales durante más de un año. La fiscal Meléndez presentó su demanda por “una sola causa de acción, por los daños causados por la serie de artículos”. (Énfasis en el original). Meléndez v. El Vocero de *203 Puerto Rico, supra, págs. 392-393 Las angustias mentales y los daños a la reputación reclamados responden a la diseminación continua y constante de expresiones que aseve-raban que el hostigamiento se llevó a cabo y que esos he-chos se estaban tratando de ignorar mediante el encubrimiento y las estrategias legales. Por lo tanto, para determinar los daños causados por la difamación debemos considerar el efecto acumulativo de todas las publicaciones vistas como un conjunto.
VIII

Daños

Como próximo señalamiento de error, la señora Marrero y la prensa argumentan que los daños concedidos a la li-cenciada Meléndez no están sostenidos por la prueba so-metida en el juicio, toda vez que no se presentó prueba pericial de sus daños morales. Plantean, igualmente, que la valoración de los daños es exagerada, al punto de ser punitiva. Según detallamos a continuación, coincidimos que las sumas otorgadas por el Tribunal de Primera Ins-tancia son excesivas, por lo que deben reducirse.
“[R]eiteradamente hemos establecido que los tribunales apelativos no deben intervenir con la estimación de los daños que realicen los tribunales de instancia a menos que las cuantías concedidas sean ridiculamente bajas o exageradamente altas”. (Enfasis nuestro). S.L.G. v. F.W. Woolworth & Co., 143 DPR 76, 83 (1997) Además, la norma impone a la parte que solicita la modificación de los daños la obligación de "demostrar la existencia de las circunstancias que hacen meritorio que se modifiquen”. Id. Véanse: Herrera, Rivera v. S.L.G. Ramírez-Vicéns, 179 DPR 774 (2010); Sagardía de Jesús v. Hosp. Aux. Mutuo, 177 DPR 484, 509-510 (2009); Vázquez Figueroa v. ELA, 172 DPR 150, 157—158 (2007) (no se puede “reducir la cuantía concedida a una cifra irrisoria que no guarda ninguna propor- *204 ción con los daños sufridos”); S.L.G. Rodríguez v. Nationwide, 156 DPR 614, 623 y 630 (2002) (“el peticionario deberá demostrar pasión, prejuicio, error manifiesto o parcialidad por parte del foro recurrido al momento de hacer las [estimaciones de los daños]”); Nieves Cruz v. U.P.R., 151 DPR 150, 170 (2000); Blás v. Hosp. Guadalupe, 146 DPR 267, 339 (1998); Rodríguez Cancel v. A.E.E., 116 DPR 443, 451-452 (1985).
Por otro lado, hemos reconocido que “[a]unque la valoración de los daños puede generar múltiples criterios, lo cierto es que la decisión debe descansar —dentro de lo posible— en el juicio del juzgador de instancia, quien tuvo la oportunidad de ver la prueba de cerca y de examinar la credibilidad de los testigos”. Vázquez Figueroa v. ELA, supra, pág. 157.
Al impartir daños, un tribunal juzgador debe tener como su norte la siguiente cautela:
Conceder cuantías insuficientes en concepto de daños tiene el efecto de aminorar la responsabilidad civil a la que debe estar sujeta el causante del daño, mientras que conceder daños exa-gerados conlleva un elemento punitivo, no reconocido por nuestro ordenamiento. Por lo tanto, al adjudicar la cuantía, el tribunal debe procurar alcanzar una razonable proporción en-tre el daño causado y la indemnización otorgada. Rivera v. S.L.G. Díaz, 165 DPR 408, 430 (2005). Véase S.L.G. Rodríguez v. Nationwide, supra, pág. 628.
Una manera de velar por que los daños atribuidos sean razonables es comparar con las sumas de reclamaciones previas en condiciones parecidas, siempre que las indemnizaciones se ajusten al valor presente. Rodríguez et al. v. Hospital et al., 186 DPR 889 (2012); Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, pág. 785 (citando A.J. Amadeo Murga, El valor de los daños en la responsabilidad civil, San Juan, Ed. Esmaco, 1997, T. 1, pág. 95).
*205 “[S]i bien es cierto que no existen dos (2) casos exactamente iguales y que cada caso es distinguible según sus propias cir-cunstancias, a los fines de determinar si la valorización de los daños en un caso específico es o no adecuadla], ciertamente resulta de utilidad examinar las cuantías concedidas por este Tribunal en casos similares anteriores”. (Corchetes en el original). Herrera, Rivera v. S.L.G. RamírezVicéns, supra, pág. 785, citando a S.L.G. v. F.W. Woolworth & Co., supra, págs. 81-82.
Advertimos, no obstante, que luego de la valoración eco-nómica, estamos obligados a examinar las circunstancias particulares del litigio para asegurarnos de que procede la cuantía concedida. Véase Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, pág. 786.
En casos de difamación, particularmente, una consideración al momento de imponer daños es asegurar que no se crea un efecto disuasivo sobre la libertad de ex-presión, especialmente en cuanto a asuntos de interés público. Pérez v. El Vocero de P.R., 149 DPR 427, 442 (1999).
En Colón, Ramírez v. Televicentro de P.R., supra, pág. 712, confirmamos la pauta esbozada en Soc. de Gananciales v. El Vocero de P.R., supra, págs. 127-128, a los efectos de que una acción de difamación al amparo del Art. 1802 del Código Civil, supra, es más abarcadora que una acción al amparo de la Ley de Libelo y Calumnia. Ello porque permite que la persona perjudicada, además de ser compensada por la lesión causada a su reputación y a sus relaciones en la comunidad, también sea resarcida por otros daños, tales como las angustias mentales.
A pesar de que “la determinación o cuantificación de daños morales, tarea que ha sido descrita como uno de los ‘desafíos más delicados que plantea hoy la tarea judicial’, no debe descansar en datos materiales y prueba puramente objetiva”, el demandante sí “debe proveer evidencia que sustente que realmente quedó afectado en su *206 salud, bienestar y felicidad”. Rivera v. S.L.G. Díaz, supra, págs. 431 y 432. Asimismo, hemos señalado que “[d]e ordi-nario, una reclamación en concepto de angustias mentales requiere la presentación de prueba pericial y documental, tanto para probar la validez de la reclamación como para que la parte adversa pueda defenderse adecuadamente”. Berríos v. González et al., 151 DPR 327, 345 (2000).
Precisa mencionar, también, que en Puerto Rico rige la regla de la publicación única, donde la extensión del agra-vio, así como la distribución y circulación del rotativo, son elementos valorativos del daño. Díaz Segarra v. El Vocero, 105 DPR 850 (1977).
En el caso de autos, el Tribunal de Primera Instancia concluyó que la licenciada Meléndez sufrió angustias men-tales a consecuencia de las publicaciones de El Vocero, al igual que daños a su reputación personal. La fiscal testificó en el juicio que el 5 de noviembre de 1991 se iba a romper en pedazos de la agonía y que “no podía ni hablar, no podía levantar la voz porque [se] sentía [...] que [la] habían matado”.(60) También describió lo difícil e incómodo que fue tener que enfrentar y explicar la situación a su madre y a su hermano. Por las publicaciones, su tío le pidió que no lo acompañara más a eventos sociales. Señala la licenciada Meléndez que otro suceso que le causó gran angustia fue cuando un día llegó a su edificio de residencia y se encontró con un grupo de vecinos que se burlaban de ella. Asimismo, indicó que tenía dificultades para dormir, se sentía ansiosa y estaba obsesionada con leer todos los diarios por temor a encontrarse con otro artículo más. Testificó también que sufrió de depresión al punto de considerar el quitarse la vida, por lo que tuvo que acudir a un sicólogo y a una si-quiatra para solicitar ayuda profesional.
El grave efecto que las publicaciones tuvieron sobre el estado emocional de la licenciada Meléndez y su forma de *207 ser fue corroborado por el licenciado Rivera Martínez, quien la describió como deprimida, siempre encerrada en su oficina, poco comunicativa y que compartía muy poco con las personas. Igualmente, la fiscal Lora testificó que durante ese periodo de tiempo la autoestima de la licen-ciada Meléndez estuvo muy baja, que ésta se encontraba avergonzada y que tuvo que buscar ayuda profesional.
Según relató la licenciada Meléndez, como parte de sus labores entraba en contacto a menudo con personas que investigaba. En una ocasión, le preguntaron irrespetuosa-mente si era la misma persona acusada de hostigamiento sexual. Sentía temor de que los miembros del Jurado de los casos criminales que trabajaba la reconocieran por las fo-tos publicadas en El Vocero y que eso influenciara en sus evaluaciones laborales. También era consciente de que la querella, al igual que los comentarios que cuestionaban su orientación sexual, eran temas de alto interés que se dis-cutían por todo el Centro Judicial.
Para calcular los daños, el Tribunal de Primera Instan-cia usó como guía el promedio de daños concedidos en tres casos anteriores cuyo elemento común era que se trataban de pleitos en los que un miembro de la profesión legal ha-bía sido difamado.(61) El valor actual de la cantidad promedio para diciembre de 2003 fue $172,075.(62) Sin embargo, el tribunal de instancia encontró necesario aumentar esa cifra “considerablemente” en vista de las circunstancias particulares del caso de autos, tales como el número de *208 publicaciones, la duración y el despliegue que se dio a la serie de artículos en primera plana del periódico, y el efecto acumulativo que estas tuvieron sobre la condición emocio-nal de la licenciada Meléndez.
Por ello, el Tribunal de Primera Instancia hizo tres va-loraciones distintas en su adjudicación a favor de la licen-ciada Meléndez. El foro primario estimó los daños causa-dos por la primera publicación de El Vocero en $515,000, mientras que los daños atribuibles al efecto cumulativo del resto de la serie se adjudicaron en $1,050,000. Concedió otros $250,000 por daños a la reputación de la licenciada Meléndez, para un total de $1,815,000, además de intere-ses legales al cinco por ciento desde la fecha cuando se presentó la demanda hasta la fecha cuando se dictó la Sentencia.
El Tribunal de Apelaciones confirmó los daños otorgados por el Tribunal de Primera Instancia en su totalidad por entender que la señora Marrero y la prensa no habían fun-damentado adecuadamente que la indemnización asignada fuese arbitraria o excesivamente alta. Habiendo exami-nado rigurosamente la evidencia en autos y a pesar de que reconocemos que una serie de publicaciones falsas tiene un impacto más devastador y perjudicial en la reputación de la persona objeto de la difamación que una noticia aislada, concluimos que la suma de los daños conferidos en el pre-sente caso es demasiado alta.
En primer lugar, la concesión de más de $500,000 en daños por el primer artículo de la serie resulta improce-dente porque la causa de acción presentada es por el efecto de la serie de artículos, no por cada artículo. Ya que la demanda no reclamaba daños por “cada publicación aisla-damente, sino por los efectos acumulativos de todas las publicaciones tomadas en conjunto” —Meléndez v. El Vocero de Puerto Rico, supra, pág. 397—, no encontramos razón por la cual fijar una compensación por separado para cada artículo difamatorio.
*209 En segundo lugar, aunque el razonamiento del Tribunal de Primera Instancia de actualizar los daños concedidos en pleitos anteriores por difamación aparenta ser bueno en teoría, es impráctico e imposible en su aplicación para este caso en particular. Los dictámenes sobre los cuales el tribunal sentenciador descansó no sirven de guía para ese fin. Además, nuestra jurisprudencia no apunta a un caso similar que se pudiera utilizar como punto de partida para estimar los daños adecuados cuando se difama un funcionario público, debido a que no hemos tenido esa oportunidad desde lo resuelto en New York Times Co. v. Sullivan, supra, hasta hoy para declarar meritoria una demanda por difa-mación presentada por una figura pública en contra de los medios.
También notamos que no existe evidencia en los autos de que las publicaciones de El Vocero afectaron el rango laboral de la licenciada Meléndez u ocasionaron en forma alguna una disminución de su salario. De hecho, la licen-ciada Meléndez fue renominada y confirmada a su cargo de fiscal en el 1991. La licenciada Meléndez continuó mane-jando casos de alto interés público y gozando de su posición como Directora del CMID hasta el 1995, cuando se tras-ladó a la Fiscalía de Caguas. Luego pasó a ser Directora de la División para Combatir el Crimen Organizado y, even-tualmente, fue Fiscal Auxiliar II en la Fiscalía de Bayamón.
Por último, según consta en el expediente, la licenciada Meléndez nunca presentó prueba pericial en cuanto a sus angustias mentales ni del tiempo que duraron. Aunque ese tipo de prueba no es un requisito, su ausencia dificulta precisar la magnitud del impacto emocional que sostuvo, y que alegadamente continúa sintiendo, debido a los eventos aquí involucrados.
Dado todo lo anterior, resolvemos que el Tribunal de Primera Instancia erró al calcular que el valor actualizado de los daños sufridos por la licenciada Meléndez asciende a *210 $1,815,000.(63) Recalcamos que el criterio que debe guiar a un juez a la hora de fijar el resarcimiento debido es la razonabilidad. Sagardía de Jesús v. Hosp. Aux. Mutuo, supra, págs. 509-510. La aplicación de dicho criterio nos lleva a modificar el dictamen recurrido, a los efectos de reducir los daños adjudicados.
Hemos descartado por completo la suma concedida ex-clusivamente por la primera publicación de El Vocero de 5 de noviembre de 1991 puesto que, a base de lo antes expli-cado, no procede. Ahora bien, en cuanto al impacto nega-tivo que la serie difamatoria tuvo sobre la reputación de la licenciada Meléndez, cabe notar que la integridad y honra-dez de la fiscal como mujer y como funcionario público, así como su orientación sexual, fueron altamente discutidos en la esfera pública durante los meses que El Vocero le dio extensa cobertura a las acusaciones infundadas de hostiga-miento sexual de la señora Marrero. Considerando la tota-lidad de las circunstancias presentes en este caso, estima-mos que $250,000, suma adjudicada por el foro de instancia por daños a la reputación de la licenciada Melén-dez, es adecuada. Próximo, aun tomando en cuenta las con-secuencias emocionales que alteraron la vida de la licen-ciada Meléndez como resultado de las publicaciones difamatorias en controversia, las cuales se encuentran am-pliamente sostenidas por el testimonio en el expediente, pesa en nuestro ánimo la falta de prueba pericial en cuanto al impacto prolongado alegado. Por lo tanto, disminuimos a $100,000 la suma adjudicada por las angustias mentales sufridas por ella.
A base de todo lo anterior, opinamos que la cantidad total de $350,000 en el caso de autos representa una suma *211 razonable.(64) Véase Vázquez Figueroa v. ELA, supra, pág. 158.
IX

Temeridad y honorarios

Por último, tanto la señora Marrero como la prensa im-pugnan la determinación de temeridad e imposición de ho-norarios en su contra según consignado por el Tribunal de Primera Instancia.
La Regla 44.1(d) de Procedimiento Civil, 32 LPRAAp. Ill (ed. 2001) (Regla 44.1(d) de Procedimiento Civil),(65) establece que en la eventualidad de que una parte haya procedido con temeridad o frivolidad durante el trámite judicial, el tribunal sentenciador deberá imponerle el pago de una suma por honorarios de abogado que el juzgador entienda corresponden a tal conducta. Andamios de P.R. v. Newport Bonding, 179 DPR 503, 519-520 (2010).
Por lo tanto, si en la discreción del tribunal de instancia se determina que hubo temeridad de acuerdo con la Regla 44.1(d) de Procedimiento Civil, supra, es mandatorio imponer honorarios. P.R. Oil v. Dayco, 164 DPR 486, 511 (2005); Blás v. Hosp. Guadalupe, supra, pág. 334 (citando a Fernández v. San Juan Cement Co., Inc., 118 DPR 713, 717—719 (1987)). Solo se intervendrá con dicha determinación si media un claro abuso de esa discreción. Andamios de P.R. v. Newport Bonding, supra, pág. 520; S.L.G. Flores-Jiménez v. Colberg, 173 DPR 843, 866 (2008); P.R. Oil v. Dayco, supra, pág. 511.
Para cuantificar los honorarios que deben impo- *212 nerse conforme nuestro ordenamiento —a diferencia del método adoptado en el foro federal, que equipara la cuan-tía de honorarios concedidos a los que efectivamente pagó la parte victoriosa a su representante legal— nuestra Re-gla 44.1(d) de Procedimiento Civil, supra, exige que se “le imponga a [la] parte [temeraria], como sanción, una suma de dinero por concepto de honorarios que corresponda a esa conducta temeraria o frívola observada por ella; esto es, al grado, o intensidad, de tal conducta”. (Énfasis suprimido). Corpak, Art Printing v. Ramallo Brothers, 125 DPR 724, 738 (1990).
Esta Curia ha expresado que el concepto de temeridad es amplio. Blás v. Hosp. Guadalupe, supra, págs. 334-335. La conducta temeraria se ha descrito como aquella que “prolonga innecesariamente o que obliga que la otra parte incurra en gestiones evitables” —Marrero Rosado v. Marrero Rosado, 178 DPR 476, 504 (2010), citando a Elba A.B.M. v. U.P.R., 125 DPR 294, 329 (1990)— así como “‘una actitud que se proyecta sobre el procedimiento y que afecta el buen funcionamiento y la administración de la justicia’”, P.R. Oil v. Dayco, supra, págs. 510-511. Véase, además, S.L.G. Flores-Jiménez v. Colberg, supra, págs. 866-867; Domínguez v. GA Life, 157 DPR 690, 706 (2002); Blás v. Hosp. Guadalupe, supra, págs. 334-337.
En innumerables ocasiones hemos señalado, sin embargo, que “[l]a temeridad es improcedente en aquellos litigios que encierran planteamientos complejos y novedosos aun no resueltos en nuestra jurisdicción”, así como “cuando la parte concernida responde a lo que resulta ser una apreciación errónea del derecho” o una “desavenencia honesta” en cuanto a la aplicación del Derecho, especialmente cuando no existan precedentes vinculantes. Maderas Tratadas v. Sun Alliance et al., 185 DPR 880 (2012), citando a Santiago v. Sup. Grande, 166 DPR 796, 821 (2006), y a Oliveras, Inc. v. Universal Ins. Co., 141 DPR 900, 936 (1996); Santos Bermúdez v. Texaco P.R., Inc., 123 *213 DPR 351 (1989). Así pues, en C.O.P.R. v. S.P.U., 181 DPR 299, 349 (2011), no conferimos los honorarios por temeri-dad solicitados toda vez que el litigante perdidoso podía apelar, puesto que esbozó una controversia resuelta por primera vez vía opinión en ese caso.
En el caso de autos, el Tribunal de Primera Instancia entendió que la señora Marrero y la prensa fueron temera-rias al prolongar innecesariamente los procedimientos del pleito, afectando de este modo el buen funcionamiento de la administración de la justicia. El juzgador concluyó que “los demandados incurrieron en conducta o actuación obstinada, contumaz, temeraria o frívola al radicar una serie de mociones y recursos cuya improcedencia era clara, cuyo propósito fue dilatar los procedimientos”. Sentencia del Tribunal de Primera Instancia, pág. 102, Caso Núm. AC-2007-66, Pieza 2, Apéndice de la Apelación civil, pág. 000638. En consecuencia, considerando los factores establecidos en Corpak, Art Printing v. Ramallo Brothers, supra, impuso el pago de $100,000 por honorarios de abo-gado, además de intereses legales al cinco por ciento desde la fecha de la presentación de la demanda hasta la fecha cuando se dictó la Sentencia. El foro apelativo intermedio confirmó dicha determinación y resolvió que el Tribunal de Primera Instancia no abusó de su discreción, ya que había base suficiente en el expediente para concluir que los apelantes habían sido temerarios durante el trámite de su caso.
Diferimos de la determinación de temeridad del tribunal primario y consideramos que el juez de instancia no ejerció su discreción debidamente. Si bien es cierto que los procedimientos del litigio se extendieron prolongadamente —no se puede negar este hecho dado que la demanda se presentó en junio de 1992 y la Sentencia no se emitió hasta marzo de 2004, es decir, casi doce años más tarde— no encontramos que los demandados provocaron la dilación intencional o estratégicamente. Por el contrario, varias de *214 las interrupciones ocurridas a través del largo trayecto judicial fueron justificadas.
Un total de veintisiete incidentes apelativos surgieron antes de comenzar el juicio. Mediante estos recursos, iniciados tanto por la licenciada Meléndez como por los de-mandados, se presentaron varias controversias novedosas, al punto que en dos ocasiones estimamos necesario expre-sarnos en torno a ellas. Véase Meléndez v. Caribbean Int’l. News, supra; Meléndez v. El Vocero de Puerto Rico, supra. Posteriormente, luego de transcurridos cincuenta y cuatro días del juicio, se reasignó el caso al juez Roque Colón quien, a su vez, necesitó tiempo adicional para familiarizarse adecuadamente con el expediente y los testimonios vertidos durante el juicio. Este último imprevisto representó otra complicación sustancial, aunque inevitable, en el trayecto procesal del caso que retrasó su resolución por más de un año.
La demora ocasionada por estos eventos ciertamente no puede ser imputada a los demandados como fundamento de su alegada temeridad. Oliveras, Inc. v. Universal Ins. Co., supra, pág. 936. Es menester recordar que “no puede penalizarse a un litigante que utiliza las vías judiciales para vindicar un derecho por el simple hecho de no haber prevalecido en su acción”. Santos Bermúdez v. Texaco P.R., Inc., supra, pág. 355. Abogar fielmente las defensas o teorías de ley que amparan a un representado en un caso complejo, como lo es éste, no equivale a actuar de manera frívola o contumaz.
Concluimos, por lo tanto, que la conducta de la señora Marrero y de la prensa no debe calificarse como temeridad tal como este concepto ha sido desarrollado en nuestra jurisdicción. Por ende, los honorarios de abogado y el inte-rés legal presentencia concedidos por el Tribunal de Pri-mera Instancia son improcedentes.
*215 X
Por las razones antes expuestas, reducimos el monto de los daños concedidos por angustias mentales y daños a la reputación de la licenciada Meléndez a $350,000. Por otra parte, eliminamos la concesión de honorarios de abogado, así como los intereses legales pre-sentencia, toda vez que no se obró con temeridad. Así modificada, se confirma la Sen-tencia recurrida.

Se dictará Sentencia de conformidad.

La Jueza Asociada Señora Fiol Matta hace constar las expresiones siguientes:
Estoy conforme con la Opinión, excepto en cuanto a la cuan-tía por daños otorgada a la fiscal Iris Meléndez Vega y a la eliminación de los honorarios de abogado concedidos por temeridad. Entiendo que la Opinión elabora correcta y cabal-mente los fundamentos para las determinaciones relacionadas con la sustitución del juez de primera instancia, con la defe-rencia que concedió el Tribunal de Apelaciones a las determi-naciones de credibilidad del foro inferior, con la responsabili-dad del licenciado Héctor Santiago Rivera, con el análisis de la serie de artículos como un conjunto y con la conclusión de que la parte demandante probó que la parte demandada actuó con malicia real al difamar a una figura pública. No obstante, no encuentro base para alterar la suma de $1,050,000 concedida por el Tribunal de Primera Instancia y confirmada por el Tribunal de Apelaciones para compensar las angustias mentales sufridas por la fiscal Meléndez Vega a causa de la publicación de la serie de noticias, ni para revocar la concesión de honora-rios por temeridad.
La Juez Asociada Señora Rodríguez Rodríguez concu-rrió en parte y disintió en parte con una opinión escrita. El Juez Presidente Señor Hernández Denton y la Jueza Aso-ciada Señora Pabón Charneco no intervienen. El Juez Aso-ciado Señor Martínez Torres se inhibió.

 En vista de que los hechos del presente caso ocurrieron antes del 1 de julio de 2010, aplicaremos las Reglas de Procedimiento Civil de 1979.

 Nos referiremos al señor Purcell, Caribbean International News Corp., El Vocero y el señor Roca conjuntamente como “la prensa”.

 El 15 de marzo de 2004 el juez Luis Roque Colón emitió una Resolución Enmendando Sentencia. Por medio de ésta enmendó el último párrafo de la Senten-cia dictada, condenando además a los demandados al pago de intereses legales sobre la cuantía de la Sentencia desde la presentación de la demanda hasta la fecha en que se dictó la Sentencia.

 Véanse nuestras Resoluciones de 9 de noviembre de 2007 en los recursos AC-2007-66 y AC-2007-67, y de 13 de diciembre de 2007 en el recurso CC-2007-827.

 Los siete errores alegados por la señora Marrero disponen como sigue:
“PRIMER ERROR
Erraron el Tribunal Superior de San Juan y el Tribunal de Apelaciones al dictar sentencia contra la apelante Marrero Rivera, valiéndose de una transcripción de aproximadamente cinco mil páginas, sin el beneficio de examinar y escuchar directa-mente testimonios cruciales en un caso de difamación y libelo por la publicación en la prensa de una querella de hostigamiento sexual; todo ello en violación a la cláusula de debido proceso de ley, al derecho al careo y confrontación de las partes y en menoscabo de la función judicial de adjudicar la credibilidad de los testigos cuya supremacía se concretiza en el derecho a tener un día en corte. En particular, el análisis de la Regla 64 de Procedimiento Civil —que permite discrecionalmente y por excepción utilizar un récord o transcripción por [un] Juez que sustituya a otro— expuesto por el Tribunal de Apelaciones, es contrario a las normas constitucionales aplicables a un caso de libelo y calumnia; particularmente cuando la credibilidad de los testigos está en controversia.
SEGUNDO ERROR
Erró el Tribunal de Apelaciones al brindar total deferencia al tribunal de ins-tancia en la evaluación de la prueba y concluir que ‘no nos corresponde sustituir las determinaciones de hechos que formuló el T.P.I. por unas, que cuanto más, refleja-rían una posibilidad alterna en cuanto a la interpretación de la prueba’, en contra-vención al mandato constitucional de realizar una evaluación independiente de la totalidad del récord en los casos de libelo; y al evaluar ‘los restantes señalamientos de error a base del cuadro fáctico plasmado en la sentencia del foro apelado.’
TERCER ERROR
Erraron el Tribunal Superior de San Juan y el Tribunal de Apelaciones al de-clarar con lugar la demanda contra la apelante Marrero Rivera, en contravela inmu-nidad que le cobijaba por haber presentado una querella por hostigamiento sexual ante el Departamento de Justicia y la Unidad Anti-discrimen, a tenor con la Ley Núm. 17 del 22 de abril de 1988 (prohibiendo el hostigamiento sexual), 29 LPRA [see.] 155 et seq[.] y sin examinar la prueba presentada para sostener sus alegado *136 nes en violación a la cláusula de debido proceso de ley. nción a la inmunidad que le cobijaba por haber presentado una querella por hostigamiento sexual ante el Depar-tamento de Justicia y la Unidad Anti-discrimen, a tenor con la Ley Núm. 17 del 22 de abril de 1988 (prohibiendo el hostigamiento sexual), 29 LPRA [see.] 155 et seq[.] y sin examinar la prueba presentada para sostener sus alegaciones en violación a la cláu-sula de debido proceso de ley.
CUARTO ERROR
Erraron el Tribunal Superior de San Juan y el Tribunal de Apelaciones al de-clarar con lugar la demanda contra la apelante Marrero Rivera e imponerle respon-sabilidad en daños por las publicaciones e información diseminada por el periódico El Vocero en la que ésta no tuvo ningún control, participación o poder decisional, así como por daños causados por terceros mediando actos independientes.
QUINTO ERROR
Erraron el Tribunal Superior de San Juan y el Tribunal de Apelaciones en la apreciación de la prueba al declarar con lugar la demanda contra la apelante Ma-rrero Rivera fundado en que ‘se demostró la existencia de una causa de acción por libelo’, cuando a la luz de la totalidad de la prueba no se establecieron los hechos constitutivos de falsedad, ni se demostró la existencia de malicia real.
SEXTO ERROR
Erraron el Tribunal Superior de San Juan y el Tribunal de Apelaciones al con-ceder daños y cuantías exageradas —de naturaleza punitiva— no sostenidas por la prueba testifical y en ausencia total de prueba pericial; con el agravante de que la apelada Iris Meléndez Vega optó por sustraer del juicio la prueba médica en su poder sobre su condición, tratamiento médico e impacto que tuvieron en su persona las publicaciones de prensa objeto de controversia, y al concluir que hubo daños a la reputación en contravención a la prueba desfilada.
SÉPTIMO ERROR
Erraron el Tribunal Superior de San Juan y el Tribunal de Apelaciones al im-poner honorarios de abogado por temeridad a la apelante Martha Marrero Rivera; cuando ésta ejerció las defensas que el ordenamiento constitucional le confiere ante una reclamación de libelo frívola que se instó como represalia por haber presentado una querella por hostigamiento sexual contra la Fiscal Iris Meléndez Vega”. (Énfasis en original). Caso Núm. AC-2007-67, Pieza 1, Apelación, págs. 62-64.

 Los cuatro errores alegados por la prensa son los siguientes:
“Erró el Tribunal de Apelaciones al ignorar su deber de efectuar una evaluación independiente de la prueba, en un pleito en que la apelada tiene que probar malicia real con prueba clara y convincente].]
“Erró el Tribunal de Apelaciones al no aplicar las normativas constitucionales y jurisprudenciales que, en protección de los derechos fundamentales de libertad de prensa y expresión, han desarrollado tanto este Tribunal como el Tribunal Supremo de los Estados Unidos, al amparo del Artículo II, Sección 4, de la Constitución del Estado Libre Asociado de Puerto Rico y la Primera Enmienda a la Constitución de los Estados Unidos de América].]
“Erró el Tribunal de Apelaciones al reconocerle a la apelada la existencia de daños compensables y al valorar los mismos de manera exagerada y punitiva].]
“Erró el Tribunal de Apelaciones al imponerle al apelante el pago de honorarios de abogado en concepto de temeridad”].] Caso Núm. AC-2007-66, Pieza 1, Apelación civil, pág. 6.

 32 LPRA Ap. III, R. 64 n. (ed. 2001).

 La Regia 63 federal también sostuvo cambios estilísticos en el 2007:
"If a judge conducting a hearing or trial is unable to proceed, any other judge may proceed upon certifying familiarity with the record and determining that the case may be completed without prejudice to the parties. In a hearing or a nonjury trial, the successor judge must, at a party’s request, recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness”. Fed. R. Civ. P. 63, 28 USCA (2008).

 R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed. rev., San Juan, Pubs. JTS, 1987, pág. 218.

 La demanda se presentó el 19de junio de 1992 y el juicio comenzó el 19 de junio de 2000.

 Los declarantes ante el juez Rivera González incluyeron a los testigos siguientes: el Ledo. Luis Rivera Martínez, la Leda. Zenaida Acosta Ronda, el Secretario de Justicia, la señora Marrero, la Sra. Sonia Palacios de Miranda, el fiscal Goyco y la fiscal Norma Lora Longoria (fiscal Lora).

 Orden del Tribunal de Primera Instancia (Roque Colón, J.) de 30 de marzo de 2001; Resolución del Tribunal de Primera Instancia (Roque Colón, J.) de 10 de enero de 2002.

 Resolución del Tribunal de Primera Instancia (Roque Colón, J.) de 10 de enero de 2002.

 Íd.

 Resolución del Tribunal de Primera Instancia (Roque Colón, J.) de 8 de febrero de 2002, pág. 4.

 Fue innecesario llamar nuevamente a aquellos testigos que el juez Roque Colón no escuchó, ya que la credibilidad de éstos no fue determinante para llegar a una adjudicación final.

 Nuestra jurisprudencia recoge varias fuentes de protección contra la difa-mación: el Art. II, Sec. 8 de la Constitución de Puerto Rico, LPRA, Tomo 1; la Ley de Libelo y Calumnia, 32 LPRA sec. 3141 et seq., y el Art. 1802 del Código Civil de Puerto Rico, 31 LPRA see. 5141. Giménez Álvarez v. Silén Maldonado, 131 DPR 91, 97-98 (1992); Villanueva v. Hernández Class, 128 DPR 618, 640 (1991) (que añade el referido Art. II, Sec. 4 de la Constitución de Puerto Rico como un precepto constitu-cional contra expresiones difamatorias).

 Dado que “en Puerto Rico son obligatorias las interpretaciones del Tribunal Supremo Federal sobre la relación entre la libertad de expresión y el derecho al honor o la reputación, en cuanto están basadas en la Constitución federal”, el estándar definido en New York Times Co. v. Sullivan, 376 DPR 254 (1964), rige en nuestro ordenamiento legal. (Escolio omitido). Colón, Ramírez v. Televicentro de P.R., 175 DPR 690, 705-706 (2009) (citando a Torres Silva v. El Mundo, Inc., 106 DPR 415 (1977)); Villanueva v. Hernández Class, supra, pág. 641.

 Harte-Hanks Communications v. Connaughton, 491 US 657, 667-668 (1988).

 Actualmente se debate sobre si el quantum de prueba necesario para probar el elemento de falsedad es la preponderancia de la prueba o la prueba clara y convincente. En Harte-Hanks Communications v. Connaughton, supra, pág. 661 esc. 2, el Tribunal Supremo federal negó pronunciarse en cuanto a dicha discusión. Véanse: D.A. Elder, Defamation: A Lawyer’s Guide, Deerfield, Illinois, Ed. Clark Boardman Callaghan, 2003, Sec. 7:5, págs. 7-81 y 7-82 (“Curiously and anomalously, the [Supreme] Court [of the United States] has also intimated that it has taken no position on the debate as to what evidentiary standard a public plaintiff must meet in proving falsity”); 3 Smolla Nimmer on Freedom of Speech Sec. 23:7.50, pág. 23-125 (2013) (“There is an ongoing debate over whether a plaintiff’s burden of proving falsity includes a requirement that falsity be proven with ‘clear and convincing evidence’ or merely a ‘preponderance of the evidence]’]”). En esta ocasión tampoco nos parece necesario expresarnos en cuanto a ese punto.

 Véanse: Regla 43.2 de Procedimiento Civil, 32 LPRA Ap. III (ed. 2001); Rolón v. Charlie Car Rental, Inc., 148 DPR 420, 433 (1999) (“un foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas del foro de instancia”. (Citando a López Vicil v. I.T.T. Intermedia, Inc., 142 DPR 857 (1997)).

 Véase, además, S.S. Patel, Harte-Hanks Communications, Inc. v. Connaughton: The Application of the New York Times Standard, 16 Ohio N.U. L. Rev. 725, 733-735 (1989) (“In addressing the correct standard of review to be applied, the [Supreme] Court held that in libel cases concerning public figures, a dual standard of review should be applied. First, the credibility determinations of the jury should be reviewed using the clearly erroneous standard. Second, the Court should make an independent assessment of the statements in issue to determine whether they are protected by the first amendment” (escolio omitido)).

 Véase, por ejemplo, Ocasio v. Alcalde Mun. de Maunabo, 121 DPR 37, 41 esc. 2 (1988), donde establecimos que mientras el análisis de la prueba testifical y documental en un caso de libelo sigue la norma de deferencia hacia los foros de instancia en cuanto a las determinaciones de hechos, no es así para las determina-ciones mixtas de hechos y de derecho, tales como si las publicaciones fueron negli-gentes, falsas o maliciosas.

 La única excepción a considerar es la opinión disidente del Juez Asociado Señor Rivera Pérez en Krans Bell v. Santarrosa, 172 DPR 731, 750 (2007), donde éste reconoció que “bajo el palio de nuestra Constitución y de la Constitución federal, estamos obligados a realizar un examen independiente de toda la evidencia para determinar si el dictamen apelado constituye o no una intervención indebida en el ámbito de la libertad de expresión”. (Énfasis en el original). Notablemente, sin embargo, el Juez Rivera Pérez no citó caso alguno resuelto por este Foro para sustentar este estándar de revisión, por la obvia razón de que no se había adoptado de manera expresa en nuestra jurisprudencia.

 La prensa también argumentó que el Tribunal de Apelaciones erróneamente limitó su ámbito de revisión al sostener que el Tribunal de Primera Instancia estaba en una mejor posición que el foro apelativo intermedio para evaluar la prueba testimonial. Atenderemos este señalamiento más adelante.

 Para propósitos de esta Opinión, adoptamos la frase “procedimiento legal” en lugar de “privilegio judicial” para referimos al conjunto de procedimientos seña-lados al amparo de la Sec. 4 de la Ley de Libelo y Calumnia, 32 LPRA sec. 3144.

 El Tribunal de Apelaciones tenía esto presente al advertir que sin el privilegio, un abogado que descarga su responsabilidad de representar la posición de su cliente —que no necesariamente refleja la suya— estaría a la “merced de ser penalizadlo] por ejercer su deber de defender celosamente la posición de un repre-sentado que no resultó favorecido en algún proceso”. Caso Núm. AC-2007-66, Pieza 4, Apéndice de la Apelación civil, pág. 1656.

 Cabe señalar que en Puerto Rico este privilegio está condicionado y no es absoluto. Caraballo v. P.R. Ilustrado, Inc., 70 DPR 283 (1949). Véase también Cortés Portalatín v. Hau Colón, 103 DPR 734, 739 (1975) (un “privilegio restringido”).

 Estas cartas se enviaron los días 15 de noviembre, 5 de diciembre (dos cartas ese día) y 30 de diciembre de 1991, y 16 de marzo de 1992.

 Varios testimonios posteriores desmintieron esas aseveraciones.

 Cabe señalar que la licenciada Meléndez, igualmente, destacó en su alegato que no demandó al licenciado Santiago Rivera por haber cursado las cartas difama-torias al Secretario de Justicia, sino por haberlas enviado a la prensa.

 Los participantes nombrados en la carta fueron la Sra. Luz E. Machuca (señora Machuca), el fiscal José A. Santiago Martínez (fiscal Santiago Martínez), elfiscal Paquito Rivera y “otros fiscales”.

 No discutiremos el contenido de las otras tres cartas intercambiadas, porque no incluyen alegaciones referentes a la licenciada Meléndez ni al tema del supuesto “amapucho”. En la segunda y tercera cartas, ambas del 5 de diciembre de 1991, siquiera se encuentra el nombre de la licenciada Meléndez. El propósito del segundo mensaje era pedir que la Leda. Zenaida Acosta fuera relevada de su función de investigar la querella porque representaba un conflicto de intereses, mientras que la tercera solo pedía que se le proveyera a la señora Marrero una copia de su declara-ción jurada. La cuarta carta, de 30 de diciembre de 1991, se refería al comporta-miento de la fiscal Felicita Jomp Vázquez.

 Ahora bien, no cabe duda de que en Puerto Rico la doctrina de of and concerning the plaintiff no impide el ejercicio de una causa de acción instada por terceros por los daños que sufrieron a causa de la difamación de otro, siempre que la publicación identifique personalmente a quien por cuya difamación estos reclaman. Soc. de Gananciales v. El Vocero de P.R., 135 DPR 122 (1994). Esta es una causa de acción contingente a la causa de acción principal que tiene el difamado. íd., pág. 135. Sin embargo, en el presente caso la licenciada Meléndez no planteó este fundamento alternativo ni presentó prueba de los daños que sufrió por los comentarios que implicaban la alegada conducta ilícita de sus compañeros en el Departamento de Justicia. Por lo tanto, no nos ha colocado en una posición apropiada para aplicar la norma de Soc. de Gananciales v. El Vocero de P.R., supra, a este caso.

 AI preguntársele con qué fiscal había hablado de su caso antes del 5 de noviembre de 1991, la señora Marrero contestó: el fiscal José Gilot Robledo, el fiscal Paquito Rivera, el fiscal Santiago Martínez y el fiscal Goyco. También mencionó haber hablado con las señoras Machuca, Mayda Alicea (señora Alicea) y Elba Mejías Muñiz (señora Mejías).

 Entre ellos el fiscal Roberto González Rivera, el fiscal Osvaldo Rivera Maldonado y el fiscal Santiago Martínez. El Ledo. Roberto Buono Grillasca (licenciado Buono) también declaró en cuanto a la excelente capacidad de la señora Marrero como secretaria.

 Del testimonio de la licenciada Meléndez surge que ésta no recordaba la fecha exacta cuando se fue de vacaciones y aproximó que fue entre esos dos meses.

 El señor Purcell lo describió como una “kilométrica entrevista de cuatro o cinco horas”.

 La señora Marrero desistió de esta querella de forma voluntaria, supuesta-mente para poder proseguir en el tribunal federal.

 A base de dicha determinación, la señora Marrero fue despedida de su puesto en el Departamento de Justicia. Sin embargo, después de presentar un re-curso legal que se resolvió a su favor, ésta fue reinstalada en el 1993 a su posición de Secretaria Legal I adscrita a la Secretaría Auxiliar de Asuntos Monopolísticos del Departamento de Justicia por el entonces Secretario de Justicia, Ledo. Pedro Pierluisi.
De otra parte, en febrero de 1992, la señora Marrero instó un procedimiento judicial en el tribunal federal en contra del Departamento de Justicia, la licenciada Meléndez y el fiscal Goyco a causa del alegado hostigamiento sexual y supuesto encubrimiento de la querella por funcionarios de dicho departamento. Sin embargo, el caso inicialmente fue desestimado por el foro federal por razones procesales, mien-tras que el subsiguiente caso fue desistido voluntariamente por la señora Marrero en cuanto a la licenciada Meléndez.

 La señora Mejías también testificó que en una ocasión, en febrero de 1991, la licenciada Meléndez le pidió que se quedara hasta tarde para terminar de trans-cribir unas declaraciones de testigos que se iban a juramentar el próximo día, y que mientras hacía el trabajo pedido, la fiscal se le presentó en la oficina vestida en ropa interior para decirle lo contenta que estaba con su trabajo. No obstante, solo le informó de este incidente a su esposo, a la señora Marrero y a una tal Loyda. La licenciada Meléndez negó que esto ocurriera. Resulta curioso, sin embargo, que aun-que la señora Marrero tuvo conocimiento de dicho incidente para febrero de 1991 —el cual es sumamente pertinente a sus propias alegaciones de hostigamiento sexual por parte de la licenciada Meléndez— el suceso no se reseñó de forma alguna en la serie del periódico objeto de esta causa de acción, el cual abarcó desde noviem-bre de 1991 hasta septiembre de 1993. Lo imputado por la señora Mejías contra la licenciada Meléndez no se anunció sino hasta su deposición tres años más tarde.

 Harte-Hanks Communications v. Connaughton, supra, pág. 668 (“Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant’s state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry” (citas omitidas)); Smolla and Nimmer on Freedom of Speech, supra, Sec. 23:3, págs. 23-25 a 23-26 (“While ill-will malice may not be equivalent to actual malice, it is nonetheless a factor that may be considered in determining whether actual malice exists”).

 St. Amant v. Thompson, 390 US 727, 732 (1968):
“The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher’s allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports”. (Escolio omitido).

 Curiosamente, todos los fiscales que nombró como fuentes niegan haberle suplido información, incluyendo los fiscales Santiago Martínez y Paquito Rivera.

 “Pregunta: Nunca se planteó que nada de eso fuese cierto?
Respuesta: No, no, no, yo, yo tan pronto me entero de, de todo esto, estoy con-vencido de que esto era cierto y luego el tiempo me dio la razón, [...]”. Deposición del señor Purcell de 4 de octubre de 1995, pág. 138.

 “Pregunta: Contempló usted la posibilidad de que no hubiese una querella radicada?
Respuesta: No, señora, no tengo por qué dudar si algunos fiscales y otra gente me dice que ya ella le ha dicho que ha estado en conversación con Goyco desde junio, no tengo por qué negarlo [...]
Repuesta: Digo, por qué no creerlo, perdone.
Pregunta: A ese momento el señor Goyco se lo ha negado y usted ha rechazado la negativa del señor Goyco por las razones que nos dio ahorita?
Repuesta: Sí, señora. Eso es lo que hace que no se publique este primer artículo”. Deposición del señor Purcell de 4 de octubre de 1995, págs. 129-130.

 La fiscal Lora testificó que la conversación con el señor Purcell transcurrió de la manera siguiente:
‘Yo le dije: ‘¿Pero tú hablaste eso con Iris o con Martha?’ Me dijo que no, que él no sabía quién era Martha. Entonces yo le dije quien era Martha [...] Entonces le dije: ‘Pero habla con Iris.’Y me dice: Yo no tengo nada que hablar con Iris sobre eso. Yo sé que lo que me dijeron es cierto.’Yo dije: ‘Pero es que tú no puedes creer una cosa tan ilógica como esa. Tú sabes muy bien que eso no puede ser.’Y me dijo: ‘No, eso es cierto’ [...] [É]l dijo que a él le había parecido raro de primera intención”. Transcrip-ción de 20 de diciembre de 2000, pág. 348.

 El señor Purcell resumió que para el artículo del 5 de noviembre de 1991, el primero de la serie, solo había hablado con la señora Marrero, el fiscal Goyco y el licenciado Buono, aunque este último negó haber hablado con él. No estimó necesario para su investigación periodística dedicar tiempo para hablar con las demás perso-nas mencionadas en su primer borrador.

 “Pregunta: Cuál, perdóneme, señor Purcell [...] cuál es el tiempo que se dedicó de lleno para investigar esto?
Repuesta: Ah, sí, desde que el licenciado Marchand me notifica que no me puede autorizar la publicación, eso debe ser a mediados de agosto, 18, 19, 20, no puedo precisar, licendiada.
Hasta el 5 de novi [...] bueno, no, yo escribo el 4 y se publica 5”. Deposición del señor Purcell de 4 de octubre de 1995, págs. 117-118.

 Véase lo indicado en las notas al calce número 41 y 42.

 Aunque los artículos de El Vocero incluyeron la negación del fiscal Goyco de que hubo hostigamiento sexual, este hecho no necesariamente atempera el cálculo de malicia real. Harte-Hanks Communications v. Connaughton, supra, págs. 680-681 (el artículo difamatorio también incluía la negación del difamado y su versión contraria de los hechos).

 En cuanto a la señora Alicea, el señor Purcell expresó lo siguiente:
“Pregunta: Se planteó usted la posibilidad, don José, de que fuese que lo iba a negar porque en efecto no había ocurrido?
Respuesta: No, no, no me interesaba eso”. Deposición del señor Purcell de 4 de octubre de 1995, pág. 192.

 Véase Elder, op. cit, pág. 7-139 (“[A] reporter is not compelled to accept [a plaintiff’s] denials as determinative or to accept them over apparently believable accusations [...] However, such denials, although not decisive either way, are at least evidence to be considered on the issue of constitutional actual malice and may, together with other factors, be highly probative of actual malice” (escolios omitidos)). Véase, también, Smolla Nimmer on Freedom of Speech, supra, Sec. 23:3, pág. 23-28, que señala:
“A person who is the subject of a story being investigated will often strongly deny the defamatory charges [...] Such a denial may or may not impact on the actual malice calculus, depending on the circumstances. If the denial is of a kind that would plausibly induce subjective doubt, then the denial may be a factor that can be used to *194 construct a case for the existence of actual malice, for once a publisher has reasons to doubt the accuracy of a story, the publisher must act reasonably to dispel those doubts prior to publishing’. (Énfasis nuestro).

 “Pregunta: Que si a usted le llamó la atención que todas estas personas desde mantenimiento hasta jueces del apelativo, le preguntaran que si esto, refirién-dose a los artículos que nos tienen aquí, era cierto?
Respuesta: No me llamó la atención. No”.
“Pregunta: A usted no le preocupaba que si eran muchas las que estaban ne-gando, eso para su función periodística era importante?
Respuesta: No, señora. Yo no ando recogiendo encuestas [...]”.
“Pregunta: Unjú. Y lo que quiero tener claro, señor Purcell, es por qué usted entendía que los que les estaban diciendo que esto no era cierto, a esos usted no tenía que prestarle mucha atención?
Respuesta: Yo los escucho a todos por igual [...]
Pregunta: Anjá. fclORespuesta: Escuchaba a los que me decían que dudaban de que doña Iris y también escuchaba a los otros.
Pregunta: Unjú [...]?
Respuesta: No usé sus opiniones para nada de mis artículos; entonces lo que hice fue atenderlos por cortesía porque no usé nada de sus revelaciones, de sus opiniones para mis artículos, eso está claro.
Pregunta: Entonces, señor Purcell [...]
Respuesta: Diga.
Pregunta: La pregunta es si entiende usted que para su función periodística es importante prestarle atención a los que le están diciendo que es falsa la publicación?
Respuesta: Je, je, nadie me ha dicho que era falsa, eso lo dice usted y aún asumiendo de que me dijeran, mira, José, yo creo que eso es falso [...]
Pregunta: Unjú [...]
Respuesta: [...] eso a mí no me interesaba, como no me interesaba los que me dijeran que sí que era lesbiana”. Deposición del señor Purcell de 4 de octubre de 1995, págs. 79, 84 y 85-87.

 Citamos directamente a El Vocero:
“Alega Mart[h]a que decidió acudir a Goyco para pedir el traslado debido a la tremenda presión que recibía de la fiscal Meléndez porque no cedía a sus acerca-mientos sexuales y las insinuaciones que la fiscal le hacía constantemente.
[...] Aseguró Mart[h]a a EL VOCERO que sus angustias con la fiscal Meléndez comenzaron desde que la fiscal llegó al Centro de Denuncias en septiembre pasado. ‘La cogió conmigo desde el principio’, dijo la atribulada mujer, madre de tres niños. Días después de asumir su puesto como directora, la fiscal Meléndez le dijo a Mart[h]a que le ‘encantaba su pelo, que era muy bonito para jugar con el’ y de inmediato le metió la mano por debajo del cabello y le ‘acarició la nuca, apretándola y haciéndole cosquillas’. Segundos más tarde volvió al ataque la fiscal Meléndez y le ‘sobó el cuello’ a la vez que le expresó ‘tienes un pelo muy bello, precioso’.
A partir de ese momento, Mart[h]a asegura que se percató de las intenciones de la fiscal, que no perdía tiempo en hostigarla y decirle lo bonita que era, las ‘troncos de piernas que se gasta’ y la pregunta de todos los días, ‘¿Qué haces tú para que los machos se enchulen de ti?’
[...] [E]l 21 de diciembre del 90 [...] a las 11:30 AM al momento de Mart[h]a estar sacando unas copias en la máquina que está en el pasillo frente a su oficina, la fiscal Meléndez se acercó y le ‘agarró la nalga derecha’ y le comentó, ‘estás engordando, mama’. Afirmó Mart[h]a que la fiscal Meléndez se pasaba todo el tiempo hablándole de la belleza de su cuerpo, de las combinaciones de ropas que hacía y le advertía constantemente que nunca se le presentara sin maquillarse porque, ‘a mi me gusta verte bien arreglada y pintada’.
[...] Otras de las muchas insinuaciones que la fiscal Meléndez le hizo a Mart[h]a fue cuando la secretaria le dio su regalo de Navidad, consistente en un juego de ropa íntima y que al agradecerle el obsequio, la fiscal dijo, ‘esto está muy lindo pero es para ponérmelo en una ocasión especial aunque tenga que esperar’.
La gota que colmó la copa sucedió en marzo de este año en ocasión de estar Mart[h]a archivando en su oficina. Dijo que la fiscal Meléndez se acercó sigilosa-mente, se paró detrás de ella y después de quitarse los zapatos, y expandir las piernas hacia el lado, como es su costumbre, se llevó las manos a la cintura y le comentó, ‘que chula te ves en esa ropa, que buena estás’. Mart[h]a dijo que se había quitado el ‘blazer’ para estar más cómoda y se quedó con una blusa sin mangas, exponiendo los hombros. Dijo que cuando quiso ponerse el ‘blazer’, la fiscal Meléndez le dijo, ‘no, no lo hagas que te ves bien sexy así’ ”. Caso Núm. CC-2007-827, Pieza 1, Apéndice de la Petición de certiorari, pág. 86.

 El artículo, en su parte pertinente, expuso lo siguiente:
“Pero Martha notaba el progreso de los acercamientos porque ya la Fiscal no sólo le decía cositas, sino que le pasaba las manos por los hombros, le cogía las manos ligeramente y le hablaba con voz suave y melosa [...]
Entiende Martha que la situación se convirtió en intolerable, al comenzar el mes de diciembre del '90 [...] Dijo la querellante que también fue criticada por Iris, que le censuró el uso de una pantalla que alegadamente no le pegaba con una hebilla de pelo que Martha llevaba recogiéndose el cabello.
[...] Señaló la perjudicada que transcurrieron varios segundos antes de que la Fiscal le soltara la nalga, pero mientras le hizo la observación de la gordura, la Fiscal movió su mano varias veces, “como tanteando la masa que agarraba”. Caso Núm. CC-2007-827, Pieza 1, Apéndice de la Petición de certiorari, pág. 94.

 El artículo, en su parte pertinente, dispuso:
“Dijo Martha, que su jefa se puso histérica y como siempre hacía dio puños sobre su escritorio al tiempo que les insinuó que se habían ido para otro lugar en vez de almorzar. Cuando Martha le salió al paso por las inferencias que hacía en su regaño, la Fiscal les dijo que ella ‘conocía muy bien al [fiscal] Díaz y de que era capaz de llevarlas a algún lugar en la carretera de Caguas’ ”. Caso Núm. CC-2007-827, Pieza 1, Apéndice de la Petición de certiorari, pág. 96.

 Caso Núm. CC-2007-827, Pieza 1, Apéndice de la Petición de certiorari, pág. 100.

 El peso de la prueba respecto al abuso de este privilegio recae sobre el demandante y deberá probarse con prueba independiente a la misma publicación. Cortés Portalatín v. Hau Colón, supra, pág. 740; Romany v. El Mundo, Inc., 89 DPR 604, 616 (1963); Smolla, op. cit., pág. 8-52.

 Transcripción de 21 de marzo de 2002, pág. 78.

 Estos fueron Franco v. Martínez, 29 DPR 237 (1921) (daños estimados en $5,001 a un abogado-notario); Rivera v. Martínez, 26 DPR 760 (1918) (daños estima-dos en $3,000 a un juez); Benet v. Hernández, 22 DPR 494 (1915) (daños estimados en $2,000 a un abogado). Sentencia del Tribunal de Primera Instancia, págs. 96-98, Caso Núm. AC-2007-66, Pieza 2, Apéndice de la Apelación civil, págs. 000632-000634. Los tres casos se resolvieron antes de la doctrina de difamación establecida en New York Times Co. v. Sullivan, supra.

 El Tribunal de Primera Instancia basó este cálculo en la fórmula propuesta por Antonio J. Amadeo Murga en su tratado El valor de los daños en la responsabilidad civil, San Juan, Ed. Esmaco, 1997, T. 1. Sentencia del Tribunal de Primera Instancia, págs. 95-96 y 98 esc. 144, Caso Núm. AC-2007-66, Pieza 2, Apéndice de la Apelación civil, págs. 000631-000632 y 000634.

 En el caso Krans Bell v. Santarrosa, supra, se concedieron al demandante, una figura pública, daños ascendentes a $180,000 cuando el programa de televisión SuperXclusivo anunció falsamente que “sostenía una relación extramarital con una mujer a quien le compró un apartamento, unas joyas y un vehículo de motor”. íd., pág. 734.

 Cabe señalar que junto al pago de intereses post sentencia, habiéndose emitido el dictamen el 15 de marzo de 2004, es decir, hace ya unos nueve años, el monto que debe satisfacerse de la Sentencia aumentará aún más. Véase Regla 44.3(a) de Procedimiento Civil, 32 LPRA Ap. III; C.O.P.R. v. S.P.U., 181 DPR 299, 343 y 349-350 (2011).

 Véase el esc. 1.